**NO. 24-1290**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

---

**PICTOMETRY INTERNATIONAL CORPORATION,**
**Appellant,**

**v.**

**NEARMAP US, INC.,**
**Appellee.**

---

# OPENING BRIEF OF APPELLANT

---

**Appeal from the U.S. Patent and Trademark Office**
**Patent Trial and Appeal Board in No. IPR2022-00733**

---

**HAYNES AND BOONE, LLP**

Debra J. McComas
2801 N. Harwood Street, Suite 2300
Dallas, TX 75201
Phone: (214) 651-5575

Jonathan R. Bowser
Adam L. Erickson
800 17th Street, NW, Suite 500
Washington, DC 20006
Phone: (202) 654-4503

Gregory P. Webb
6000 Headquarters Drive, Suite 200
Plano, TX 75024
Phone: (972) 739-8641

Laura N. Vu*
1 Post Street, Suite 2800
San Francisco, CA 94104
Phone: (415) 293-8930

**Admitted only to practice in District of Columbia and Maryland. Application to the California Bar is pending.*

**Attorneys for Appellant Pictometry International Corporation**

## REPRESENTATIVE PATENT CLAIMS AT ISSUE

### Patent No. 8,542,880 (Appx48–49)

1. A process for determining attributes of a roof structure of a real-world three-dimensional building, comprising the acts of:

providing at least one computer input field for a user to input first location data generally corresponding to the location of the building;

providing visual access to an aerial image of a region including the roof structure of the building corresponding to said first location data, the aerial image taken from a straight down overhead view with respect to the roof structure;

on the aerial image of the region, providing a visual marker that is moveable on a computer monitor around said region, said visual marker initially corresponding to said first location data, wherein said visual marker may be moved to a final location on top of the building to more precisely identify the location of the building roof structure, the final location having location coordinates;

providing a computer input capable of signaling user-acceptance of the final location of said marker; and,

providing visual access to one or more oblique images of an aerial imagery database corresponding to location coordinates of the final location.

2. The process of claim 1 and wherein said first location data comprised street address data, and wherein said location coordinates of said final location are translated to latitude and longitude coordinates.

3. The process of claim 2 and wherein said image corresponding to the first location data is from a first imagery database from which said final location is selected and is internet-based imagery having a corresponding street address look up field, and wherein the aerial imagery database is a second imagery database, and further comprising the act of:

using said latitude and longitude coordinates to access imagery from the second imagery database.

14. A non-transient computer memory storing computer logic, that when executed by computer hardware causes the computer hardware to determine attributes of a roof structure of a real-world three-dimensional building by:

providing at least one computer input field for a user to input first location data generally corresponding to the location of the building;

providing visual access to an aerial image of a region including the roof structure of the building corresponding to said first location data, the aerial image taken from a straight down overhead view with respect to the roof structure;

on the aerial image of the region, providing a visual marker that is moveable on a computer monitor around said region, said visual marker initially corresponding to said first location data, wherein said visual marker may be moved to a final location on top of the building to more precisely identify the location of the building roof structure, the final location having location coordinates;

providing a computer input capable of signaling user-acceptance of the final location of said marker; and,

providing visual access to one or more oblique images of an aerial imagery database corresponding to location coordinates of the final location.

15. The non-transient computer memory of claim 14, wherein said first location data comprised street address data, and wherein said location coordinates of said final location are translated to latitude and longitude coordinates.

16. The non-transient computer memory of claim 15, wherein said aerial image corresponding to the first location data is from a first imagery database from which said final location is selected and is internet-based imagery having a corresponding street address look up field, and wherein the aerial imagery database is a second imagery database, and wherein said computer logic when executed by computer hardware causes the computer hardware to:

use said latitude and longitude coordinates to access imagery from the second imagery database.

# CERTIFICATE OF INTEREST

**Case Number** 24-1290

**Short Case Caption** Pictometry International Corporation v. Nearmap US, Inc.

**Filing Party/Entity** Pictometry International Corporation

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: June 4, 2024 Signature: */s/ Debra J. McComas*

Name: Debra J. McComas

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. |
| ___ None/Not Applicable | ___ None/Not Applicable | ___ None/Not Applicable |
| Pictometry International Corporation | Eagle View Technologies, Inc. | Eagle View Technology Corporation |

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

_X_ None/Not Applicable ___ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

___ None/Not Applicable ___ Additional pages attached

| | | |
|---|---|---|
| Eagle View Technologies, Inc. and Pictometry International Corp. v. Nearmap US, Inc., 2:21CV00283 (D. Utah) | Eagle View Technologies, Inc. and Pictometry International Corp. v. GAF Materials LLC, 2:22CV00215 (D. Utah) | Pictometry International Corp. v. Roofr, Inc., 1:21-cv-01852 (D. Del.) |
| Nearmap US, Inc. v. Eagle View Technologies, Inc., IPR2022-00734 (PTAB) | Nearmap US, Inc. v. Pictometry International Corp., IPR2022-00735 (PTAB) | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

_X_ None/Not Applicable ___ Additional pages attached

| | | |
|---|---|---|
| | | |

## TABLE OF CONTENTS

REPRESENTATIVE PATENT CLAIMS AT ISSUE ........................................ ii

CERTIFICATE OF INTEREST ........................................ iv

TABLE OF CONTENTS ........................................ vi

TABLE OF AUTHORITIES ........................................ ix

STATEMENT OF RELATED CASES ........................................ 1

JURISDICTIONAL STATEMENT ........................................ 2

STATEMENT OF THE ISSUES ........................................ 3

INTRODUCTION ........................................ 5

STATEMENT OF THE CASE ........................................ 6

I. Background ........................................ 6

A. The ’880 Patent ........................................ 6

B. The Relevant Prosecution History ........................................ 11

C. The Prior Art ........................................ 12

1. Kennedy ........................................ 13

2. Florance ........................................ 13

3. Kreft ........................................ 14

II. The IPR Proceeding ........................................ 14

A. The Parties’ Disputes ........................................ 14

B. The Final Written Decision ........................................ 16

SUMMARY OF THE ARGUMENT ........................................ 18

STANDARD OF REVIEW ........................................ 20

ARGUMENT ........ 21

I. The Board's analysis of independent claims 1 and 14 fails to provide sufficient explanation, contains inconsistent reasoning, and is unsupported by substantial evidence. ........ 21

A. The Board violated the APA by failing to adequately explain why a skilled artisan would have been motivated to combine Kennedy and Florance. ........ 22

B. The Board's prior art analysis is inconsistent with its claim construction analysis. ........ 27

C. The Board incorrectly construed the "providing visual access" limitation to mean displaying. ........ 33

1. The Board erred in construing the "providing visual access" limitation to require only "displaying." ........ 33

a. The claims are ordinal and require two "providing visual access" steps. ........ 34

b. "Providing visual access" requires access and visual depiction. ........ 37

c. The prosecution history supports a construction including access and visual depiction. ........ 40

d. Claim differentiation does not exclude accessing a database from "providing visual access." ........ 42

2. Substantial evidence does not support the Board's finding that the prior art discloses limitation [1.5] under the correct construction. ........ 46

II. The Board's analysis of dependent claims 3 and 16 contains inadequate explanation and is internally inconsistent. ........ 50

A. The Board violated the APA by failing to adequately explain why the prior art discloses all the limitations of claims 3 and 16. ....................50

B. The Board's analysis of dependent claims 3 and 16 for claim construction and prior art are internally inconsistent. ....................53

CONCLUSION ....................56

CERTIFICATE OF COMPLIANCE ....................58

ADDENDUM ....................59

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.*,
265 F.3d 1294 (Fed. Cir. 2001) .......... 41

*Alacritech, Inc. v. Intel Corp.*,
966 F.3d 1367 (Fed. Cir. 2020) .......... 20, 22

*In re Applied Materials, Inc.*,
692 F.3d 1289 (Fed. Cir. 2012) .......... 21

*Augustine Med., Inc. v. Gaymar Indus., Inc.*,
181 F.3d 1291 (Fed. Cir. 1999) .......... 42

*Corephotonics, Ltd. v. Apple Inc.*,
84 F.4th 990 (Fed. Cir. 2023) .......... 28

*Cutsforth, Inc. v. MotivePower, Inc.*,
636 F. App'x 575 (Fed. Cir. 2016) (non-precedential) .......... 26, 51

*Elkay Mfg. Co. v. Ebco Mfg. Co.*,
192 F.3d 973 (Fed. Cir. 1999) .......... 41

*Hitachi Metals, Ltd. v. All. of Rare-Earth Permanent Magnet Indus.*,
699 F. App'x 929 (Fed. Cir. 2017) (non-precedential) .......... 56

*Honeywell Int'l Inc. v. Mexichem Amanco Holding S.A. De C.V.*,
865 F.3d 1348 (Fed. Cir. 2017) .......... 55

*Immunex Corp. v. Sanofi-Aventis U.S. LLC*,
977 F.3d 1212 (Fed. Cir. 2020) .......... 21

*Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*,
821 F.3d 1359 (Fed. Cir. 2016) .......... 20

*Interactive Gift Exp., Inc. v. Compuserve Inc.*,
256 F.3d 1323 (Fed. Cir. 2001) .......... 35, 39

*InterDigital Commc'ns, LLC v. Int'l Trade Comm'n*,
690 F.3d 1318 (Fed. Cir. 2012) ........................................................................43

*In re Kotzab*,
217 F.3d 1365 (Fed. Cir. 2000) ........................................................................20

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007) ........................................................................24

*Laitram, LLC v. Ashworth Bros., Inc.*,
No. 2022-1044, 2023 WL 3449148 (Fed. Cir. May 15, 2023) (non-precedential) ........................................................................45

*In re Lee*,
277 F.3d 1338 (Fed. Cir. 2002) ........................................................................20, 23, 25, 51

*Linear Techs. Corp. v. Int'l Trade Comm'n*,
566 F.3d 1049 (Fed. Cir. 2009) ........................................................................53

*Mantech Env't Corp. v. Hudson Env't Servs., Inc.*,
152 F.3d 1368 (Fed. Cir. 1998) ........................................................................35

*In re Nuvasive, Inc.*,
842 F.3d 1376 (Fed. Cir. 2016) ........................................................................23, 26, 51

*Pers. Web Techs., LLC v. Apple, Inc.*,
848 F.3d 987 (Fed. Cir. 2017) ........................................................................23, 26

*Polygroup Ltd. MCO v. Willis Elec. Co.*,
780 F. App'x 880 (Fed. Cir. 2019) (non-precedential) ........................................................................55

*Purdue Pharma L.P. v. Epic Pharma, LLC*,
811 F.3d 1345 (Fed. Cir. 2016) ........................................................................21

*Seabed Geosolutions (US) Inc. v. Magseis FF LLC*,
8 F.4th 1285 (Fed. Cir. 2021) ........................................................................39

*TQ Delta, LLC v. Cisco Sys., Inc.*,
942 F.3d 1352 (Fed. Cir. 2019) ........................................................................20, 23

*Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*,
239 F.3d 1225 (Fed. Cir. 2001) ........................................................................43

*Wi-Lan, Inc. v. Apple, Inc.*,
811 F.3d 455 (Fed. Cir. 2016) .......... 35

**Statutes**

5 U.S.C. § 706 .......... 20

## STATEMENT OF RELATED CASES

The patent at issue in this appeal, U.S. Patent No. 8,542,880, is currently being asserted in the following litigations:

- *Eagle View Technologies et al v. Nearmap US*, No. 2:21-cv-00283 (D. Utah); and
- *Eagle View Technologies et al v. GAF Materials LLC*, No. 2:22-cv-00215 (D. Utah) (transferred from *Eagle View Technologies, Inc. et al v. GAF Materials LLC*, No. 1:21-cv-10669 (D.N.J.)).

## JURISDICTIONAL STATEMENT

The Patent Trial and Appeal Board's Final Written Decision in IPR2022-00733 issued October 20, 2023. Appx1–19. The Board had jurisdiction pursuant to 35 U.S.C. §§ 6(b), 314(a), 316(c), 318(a).

Pictometry International Corporation ("Pictometry") timely filed a notice of appeal on December 21, 2023. *See* No. 24-1290, ECF No. 1. This Court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 141(c).

## STATEMENT OF THE ISSUES

1. Whether the Board violated the Administrative Procedure Act ("APA") by failing to adequately explain why a skilled artisan would have been motivated to combine Kennedy and Florance for independent claims 1 and 14.

2. Whether the Board's determination that the prior art disclosed the limitation "providing visual access to one or more oblique images of an aerial imagery database corresponding to location coordinates of the final location" is inconsistent with its claim construction analysis, resulting in a substantive error that requires remand.

3. Whether (a) the Board erred by failing to construe the limitation "providing visual access to one or more oblique images of an aerial imagery database corresponding to location coordinates of the final location" in independent claims 1 and 14 to require "accessing an aerial imagery database to retrieve the one or more oblique images corresponding to location coordinates of the user-accepted final location and displaying the one or more oblique images retrieved from the aerial imagery database," and (b) substantial evidence fails to support the Board's finding that the prior art discloses the limitation "providing visual access to one or more oblique images of an aerial imagery database corresponding to location coordinates of the final location" under the correct construction.

4. Whether the Board violated the APA by failing to adequately explain why the prior art discloses the limitations of dependent claims 3 and 16.

5. Whether substantial evidence fails to support the Board's finding that the prior art discloses dependent claims 3 and 16 because the Board's prior art analysis is inconsistent with its claim construction analysis.

# INTRODUCTION

This appeal arises from a Final Written Decision in an *inter partes* review proceeding that includes inadequate and inconsistent reasoning and even a substantive error in the analysis that requires vacating the Decision. For instance, the Board purports to arrive at its erroneous claim construction of the limitation "providing visual access to one or more oblique images of an aerial imagery database corresponding to location coordinates of the final location" based on a claim differentiation analysis of the dependent claims. Yet, in its obviousness analysis, the Board treats the dependent claims (or at least one of them) analogously with the independent claims, resulting in a contradictory Decision. At minimum, this requires the Court to vacate the Decision and remand the case with instructions for the Board to fully explain its reasoning.

In any event, the Board's claim construction of the "providing visual access" limitation is wrong. The correct construction—as supported by the plain language of the claims, specification, and prosecution history—for the limitation "providing visual access to one or more oblique images of an aerial imagery database corresponding to location coordinates of the final location" is "accessing an aerial imagery database to retrieve the one or more oblique images corresponding to location coordinates of the user-accepted final location and displaying the one or

more oblique images retrieved from the aerial imagery database." This construction is in no way precluded by claim differentiation. Applying the proper claim construction, there is no substantial evidence to support a finding that the prior art discloses the "providing visual access" limitation. Should the Court find that it can reach these issues despite the lack of clarity in the Board's Decision, it should vacate the Decision and remand the case for further proceedings consistent with the appropriate claim construction.

## STATEMENT OF THE CASE

This appeal arises from a Final Written Decision ("FWD" or "Decision") in an *inter partes* review ("IPR") proceeding in which the Board found claims 1–20 of patent owner Pictometry's U.S. Patent No. 8,542,880 ("the '880 patent") unpatentable as obvious.

### I. Background

#### A. The '880 Patent

The '880 patent is directed to "[p]rocesses and systems . . . for determining attributes of a roof structure of real-world three-dimensional building(s)" through the "use of aerial imagery." Appx20, Abstract, Appx42, 1:13–15. The invention may measure roofing dimensions and "other attributes," which the '880 patent defines as "one or more distinguishing or identifying characteristic[s]." Appx42, 1:13–15, 2:60–61. In particular, the invention uses "oblique" images in addition to "straight

down" or plan view images. Appx42, 2:54–57, Appx47, 11:9–16. The invention improves traditional roof measurement systems that use aerial imagery systems and processes and provides enhanced convenience, flexibility, and/or accuracy. Appx42, 1:27–29.

The '880 patent describes a process for more accurately identifying the correct roof structure in an image and obtaining associated high-quality images of different perspectives of the roof structure, allowing for more accurate measurements of the roof. The process starts by providing a computer input field for a user to input an address corresponding to a location of a building with the desired roof structure to be measured. Appx46, 9:50–59, Appx24, Fig. 4A. The input address is used to access an image of the building and its surrounding area from an imagery database such as Google Earth, which is a "lower resolution and/or less expensive image database." Appx46, 9:59–67, 10:54–61, Appx25, Fig. 4B. The image is then depicted, typically with adjacent buildings, trees, streets, and other features. Appx46, 9:62–64, Appx25, Fig. 4B. The depicted image may include a marker corresponding to the street address of the location input by the user, shown in Figure 4B below as element 106a:




Appx25, Fig. 4B, Appx46, 10:2–4. As shown in Figure 4B, the marker is close to, but does not directly correspond to, the desired roof structure to be measured. Appx46, 10:4–6.

The user may move the marker to a final location to more precisely identify the location of the roof structure. Appx46, 10:6–12, Appx26, Fig. 4C. This is shown in Figure 4C, where marker 106b is now on top of the desired roof structure:




Appx26, Fig. 4C. After the marker is moved to a final location, the user may confirm the selection of the roof structure. Appx46, 10:12–15, Appx26–27, Figs. 4C–4D.

Next, the final location is translated to latitude and longitude coordinates. Appx46, 10:47–65. The latitude and longitude coordinates are used to "access imagery from a second imagery database," where the second imagery database is "a higher quality, higher resolution and/or more robust image database, such as by Pictometry International." Appx46–47, 10:54–11:16. The accessed images may be oblique images corresponding to the roof structure to be measured. Appx46–47, 10:54–11:16. The oblique images are depicted and are advantageously used to provide

precise calculations of the roof structure without having to rely on field measurements and allow for more complete image reporting. Appx45, 8:9–13, Appx47, 11:9–20.

Independent claim 1 is representative of the independent claims and is reproduced below with added limitation numbering and emphasis showing the key limitation disputed in this appeal:

> [1.0] A process for determining attributes of a roof structure of a real-world three-dimensional building, comprising the acts of:
>
> [1.1] providing at least one computer input field for a user to input first location data generally corresponding to the location of the building;
>
> [1.2] ***providing visual access*** to an aerial image of a region including the roof structure of the building corresponding to said first location data, the aerial image taken from a straight down overhead view with respect to the roof structure;
>
> [1.3] on the aerial image of the region, providing a visual marker that is moveable on a computer monitor around said region, said visual marker initially corresponding to said first location data, wherein said visual marker may be moved to a final location on top of the building to more precisely identify the location of the building roof structure, the final location having location coordinates;
>
> [1.4] providing a computer input capable of signaling user-acceptance of the final location of said marker; and,
>
> [1.5] ***providing visual access to one or more oblique images of an aerial imagery database corresponding to location coordinates of the final location***.

Appx48 (emphasis added). Independent claim 14 recites similar limitations to claim 1 but is directed to a non-transient computer memory rather than a process. *Compare* Appx48, 13:53–14:8 (claim 1), *with* Appx48–49, 14:49–15:5 (claim 14).

Dependent claim 3 depends on claim 2 and is representative of the dependent claims. Both claims are reproduced with emphasis added on the relevant limitation:

> 2. The process of claim 1 and wherein said first location data comprised street address data, and wherein said location coordinates of said final location are translated to latitude and longitude coordinates.
>
> 3. The process of claim 2 and wherein said image corresponding to the first location data is from a first imagery database from which said final location is selected and is internet-based imagery having a corresponding street address look up field, and wherein the aerial imagery database is a second imagery database, and further comprising the act of: ***using said latitude and longitude coordinates to access imagery from the second imagery database***.

Appx48 (emphasis added). Dependent claim 16 recites similar limitations to claim 3, but like claim 14, is directed to a non-transient computer memory rather than a process. *Compare* Appx48, 14:13–21 (claim 3), *with* Appx49, 15:11–20 (claim 16). All arguments for claims 1 and 3 apply equally to claims 14 and 16, respectively.

### B. The Relevant Prosecution History

The ’880 patent is a continuation of U.S. Patent No. 8,401,222 (the ’222 patent). Appx20 at (63). Claim 1 of the ’222 patent recites the limitation "[p]roviding visual access to one or more images of an aerial imagery database corresponding to location coordinates of the final location." Appx2448, 14:11–13

('222 patent). This limitation is identical to the disputed "providing visual access" limitation [1.5] in the '880 patent, except the '880 patent additionally requires "oblique images" of an aerial imagery database. *Compare* Appx2448, 14:11–13 ('222 patent, claim 1), Appx2517, *with* Appx48, 14:6–8 ('880 patent, claim 1).

During prosecution of the '222 patent, Pictometry added the limitation "[p]roviding visual access to one or more images of an aerial imagery database corresponding to location coordinates of the final location" to the pending claims. Appx2517 ('222 patent prosecution history ("PH")). Pictometry relied in part on this limitation to distinguish the claims over the prior art. Appx2522–2526. After Pictometry added this limitation, the examiner allowed the claims based on Pictometry's arguments. Appx2486–2487.

### C. The Prior Art

In the IPR proceeding for the '880 patent, the Board found that claims 1–20 would have been obvious over three references that only contemplate a single image retrieval step:

- U.S. Patent 8,417,061 ("Kennedy"), Appx932–966;
- U.S. Patent Application 2009/0132316 ("Florance"), Appx967–1163; and
- U.S. Patent 7,373,244 ("Kreft"), Appx1164–1207.

A summary of each reference is included below.

### 1. Kennedy

Kennedy is titled "Methods and Systems for Provisioning Energy Systems" and includes an embodiment to remotely determine the measurements of a roof. Appx932, Abstract. To do so, a user may provide location information such as the address of a user-selected site. Appx955, 5:37–44. The system in Kennedy retrieves images of the location from a source of images such as a geophysical database. Appx955, 5:44–48, 6:21–32, 6:56–57. The retrieved images may include "a first image 153 comprising a plan view of the roof and a second image 154 comprising a perspective view of the roof." Appx955, 6:65–67. After retrieving both the images, Kennedy displays the images to the user so the user can interact with the system to measure portions of installation areas included in the displayed images. Appx956, 7:10–32. Kennedy is the only reference relied upon by Petitioner Nearmap US, Inc. ("Nearmap") that discloses image retrieval, and only describes a single image retrieval step.

### 2. Florance

Florance discloses a system for researching and developing information on commercial real estate properties, including "systems and methods for associating an aerial image with map features and information concerning objects appearing in the image." Appx967, Abstract. In Florance, an aerial image of a property may be displayed with an icon positioned at a preliminary position corresponding to an

approximate location of the property. Appx1157, ¶¶ 622–623. A user may look at the aerial image of the property and the position of the icon, determine a more accurate position for the icon, and move the icon (e.g., by clicking and dragging) to a more accurate position. Appx1157–1158, ¶ 624.

#### 3. Kreft

Kreft describes methods for "locating points of interest [POIs]" on geographic maps. Appx1164, Abstract. Kreft explains that "[a] variety of symbols or icons are used to mark POI's on a map." Appx1198, 15:57–58. According to Kreft, users may move these POI markers and confirm the marker's new location via a dialog box. Appx1199, 18:13–14, 18:63–66.

## II. The IPR Proceeding

### A. The Parties' Disputes

Nearmap, a competitor of Pictometry that has been accused of infringing the '880 patent, filed a petition for *inter partes* review challenging claims 1–20 of the '880 patent ("Petition"). Appx57, Appx61. Relevant to this appeal, Nearmap asserted that claims 1–20 are unpatentable as obvious over Kennedy, Florance, and Kreft. Appx68–119. Nearmap contended that "no formal claim constructions [were] necessary" in the IPR proceeding. Appx67. After Pictometry filed its Preliminary Patent Owner Response (Appx161–234), the Board instituted review of Nearmap's Petition (Appx235–258).

During the IPR proceeding, Pictometry proposed a construction for limitation [1.5], "providing visual access to one or more oblique images of an aerial imagery database corresponding to location coordinates of the final location." Appx278–283. Pictometry asserted that the claims required two separate "providing visual access" steps, the first in limitation [1.2] and the second in limitation [1.5] of claim 1, and that the second "providing visual access" limitation in limitation [1.5] must occur after user-acceptance of the final location of the marker on top of the building in limitation [1.4]. *See* Appx278–279. Pictometry also asserted that the "providing visual access" limitation in limitation [1.5] required more than simply providing a visual depiction of an oblique image that corresponds to location coordinates of the final location—it required "accessing" (i.e., obtaining or retrieving) the oblique image from the recited aerial imagery database and visually depicting (i.e., displaying) the oblique image. Appx280–281. Thus, the limitation "providing visual access to one or more oblique images of an aerial imagery database corresponding to location coordinates of the final location" required the access and display of oblique images based on location coordinates corresponding to the final location to occur after the final location was determined based on user-acceptance of the final location of the marker. Appx281; *see also* Appx389–399 (PO Sur-Reply).

Under this proposed construction, Pictometry argued that Nearmap's prior art failed to disclose limitation [1.5] because the prior art did not disclose a later-occurring second image retrieval step. Appx285–293 (PO Resp.), Appx399–402 (PO Sur-Reply). Additionally, Pictometry asserted that Nearmap's prior art failed to disclose using latitude and longitude coordinates to access oblique images from dependent claim 3. Appx293–294 (PO Resp.). Pictometry further argued that Nearmap had not shown sufficient motivation to combine Kennedy and Florance. Appx297–305 (PO Resp.), Appx402–406 (PO Sur-Reply).

Nearmap disputed Pictometry's construction of the "providing visual access" limitation in limitation [1.5], but did not propose an alternative construction. Appx355–361 (Reply). Nearmap continued to assert that the prior art combination of Kennedy, Florance, and Kreft taught limitation [1.5] and claim 3, and that the Petition had shown sufficient motivation to combine Kennedy and Florance. Appx361–371 (Reply).

**B. The Final Written Decision**

In its Final Written Decision, the Board disagreed with Pictometry's proposed construction for limitation [1.5] and construed "providing visual access" to "require[] only displaying . . . images that have come from an aerial image database." Appx5–6. The Board's analysis relied exclusively on the plain language

of claim 1 and claim differentiation, explaining that "nothing in the term's plain language requires accessing a database" and "the doctrine of claim differentiation undermines [Pictometry's] construction because dependent claim 3 expressly recites the database-access step [Pictometry] seeks to add to claim 1, which does not have that language." Appx6.

Nonetheless, the Board determined that the combination of Kennedy, Florance, and Kreft discloses the "providing visual access" limitations in limitations [1.2] and [1.5] under its own construction and Pictometry's construction. Appx9–11. Under its adopted construction requiring only displaying, the Board stated that "although claims 1 [independent] and 16 [dependent to claim 14, which expressly recites a database-access step] recite two separate 'providing visual access' steps, they do not recite any database-access steps" and determined without analysis that Nearmap's proposed combination of Kennedy, Florance, and Kreft "would provide both visual-access steps." Appx10. Under Pictometry's proposed construction, the Board stated that "[Nearmap's] rationale for combining the references (i.e., improving accuracy, *see* [Appx78–80]) explains why one skilled in the art would have retrieved Kennedy's two images in separate steps, separated by a user's confirmation." Appx10.

Despite determining that independent claim 1 and dependent claim 3 had different claim scope based on claim differentiation for purposes of claim construction, in addressing obviousness for dependent claim 3, the Board concluded that "as explained above, [Nearmap]'s asserted combination and rationale adequately account[ed] for a second image retrieval step." Appx11 n.6. This statement is found in a two-sentence footnote without further explanation. Appx11 n.6. As to motivation to combine, the Board stated that "[g]iven [Nearmap's] accuracy-improvement rationale, [Nearmap] has articulated sufficient reasoning with rational underpinning to support its assertion that including Florance's movable markers in Kennedy's system would have been obvious to one skilled in the art," again without further explanation. Appx13.

## SUMMARY OF THE ARGUMENT

For independent claims 1 and 14, the Board's Decision contains inadequate explanations and inconsistencies, resulting in three errors that each warrant vacatur and remand.

***First***, the Board's motivation to combine analysis consists of a single sentence that does not explain why the Board adopted Nearmap's position and does not otherwise cite any parts of the record or the parties' briefs. The Board's analysis fails to satisfy its obligation to provide a logical and reasoned explanation under the APA.

***Second***, the Board's finding that the prior art discloses the "providing visual access to one or more oblique images of an aerial imagery database corresponding to location coordinates of the final location" limitation is premised on its determination that claim 16 does ***not*** recite any database steps. Yet in its claim construction analysis, the Board recognized that the claim language in claim 16 required database access. The Board's inconsistent characterization of the language in claim 16 is a substantive error that requires remand for further explanation.

***Third***, the Board erred in construing "providing visual access to one or more oblique images of an aerial imagery database corresponding to location coordinates of the final location," to only require displaying images from an aerial image database. Although the Board found in the alternative that the prior art discloses this disputed limitation even under Pictometry's construction, substantial evidence does not support that finding.

Similar inadequate explanations and inconsistencies also appear in the Board's analysis for dependent claims 3 and 16. The Board addressed dependent claims 3 and 16 in a single sentence that (1) did not cite any parts of the record, the parties' briefs, or the Board's own Decision and (2) did not address all the limitations of the claim. Additionally, the Board's obviousness analysis of dependent claims 3 and 16 (where the Board grouped together claims 1 and 3) is inconsistent with its

claim construction analysis (which applies claim differentiation between claims 1 and 3). Vacatur and remand is, therefore, also warranted for dependent claims 3 and 16.

Accordingly, the Court should vacate and remand the Board's Decision.

## STANDARD OF REVIEW

The Court reviews the Board's decisions under the standard set forth in the Administrative Procedure Act, which requires the Court to "set aside conclusions or findings that are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' or 'unsupported by substantial evidence.'" *Alacritech, Inc. v. Intel Corp.*, 966 F.3d 1367, 1370 (Fed. Cir. 2020); 5 U.S.C. § 706(2)(A), (E). "[T]he Board is obligated to 'provide an administrative record showing the evidence on which the findings are based, accompanied by the agency's reasoning in reaching its conclusions.'" *TQ Delta, LLC v. Cisco Sys., Inc.*, 942 F.3d 1352, 1358 (Fed. Cir. 2019) (quoting *In re Lee*, 277 F.3d 1338, 1342 (Fed. Cir. 2002)).

The Board's legal determinations are reviewed de novo and its underlying factual determinations for substantial evidence. *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1366 (Fed. Cir. 2016). "Substantial evidence is something less than the weight of the evidence but more than a mere scintilla of evidence." *In re Kotzab*, 217 F.3d 1365, 1369 (Fed. Cir. 2000). It is "such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.*"* *In re Applied Materials, Inc.*, 692 F.3d 1289, 1294 (Fed. Cir. 2012) (citation and internal quotations omitted).

The Court reviews "the Board's claim construction de novo and any underlying factual findings for substantial evidence." *Immunex Corp. v. Sanofi-Aventis U.S. LLC*, 977 F.3d 1212, 1217 (Fed. Cir. 2020). Obviousness is a legal question based on underlying fact findings. *Purdue Pharma L.P. v. Epic Pharma, LLC*, 811 F.3d 1345, 1351 (Fed. Cir. 2016).

## ARGUMENT

### I. The Board's analysis of independent claims 1 and 14 fails to provide sufficient explanation, contains inconsistent reasoning, and is unsupported by substantial evidence.

The Board's Decision regarding claims 1 and 14 should be vacated and remanded for three independent reasons. ***First***, the Board violated the APA by failing to adequately explain why there is a motivation to combine Kennedy and Florance. ***Second***, the Board's finding that the prior art discloses the "providing visual access to one or more oblique images of an aerial imagery database corresponding to location coordinates of the final location" limitation is premised on a characterization of claim 16 that contradicts the Board's interpretation of the same language for claim construction. ***Third***, the Board erred in construing "providing visual access to one or more oblique images of an aerial imagery database

corresponding to location coordinates of the final location," to only require displaying images from an aerial image database. Substantial evidence does not support the Board's alternative finding that the prior art discloses this limitation under Pictometry's correct construction.

### A. The Board violated the APA by failing to adequately explain why a skilled artisan would have been motivated to combine Kennedy and Florance.

The Board's substantive analysis for motivation to combine Kennedy and Florance consisted of a single sentence: "Given [Nearmap's] accuracy-improvement rationale, [Nearmap] has articulated sufficient reasoning with rational underpinning to support its assertion that including Florance's movable markers in Kennedy's system would have been obvious to one skilled in the art." Appx13. This conclusory statement fails to adequately articulate a motivation to combine Kennedy and Florance as required by the APA.

Under the APA, the Court must "set aside [the Board's] conclusions or findings that are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' or 'unsupported by substantial evidence.'" *Alacritech*, 966 F.3d at 1370 (quoting 5 U.S.C. § 706(2)(A), (E)). To "provide for effective judicial review . . . the Board is obligated to 'provide an administrative record showing the evidence on which the findings are based, accompanied by the agency's reasoning in

reaching its conclusions.'" *TQ Delta*, 942 F.3d at 1358 (quoting *Lee*, 277 F.3d at 1342); *see Lee*, 277 F.3d at 1342 ("For judicial review to be meaningfully achieved within these strictures, the agency tribunal must present a full and reasoned explanation of its decision. The agency tribunal must set forth its findings and the grounds thereof, as supported by the agency record, and explain its application of the law to the found facts."). Thus, "[t]he Board, as an administrative agency, must articulate logical and rational reasons for its decision." *Pers. Web Techs., LLC v. Apple, Inc.*, 848 F.3d 987, 992 (Fed. Cir. 2017) (cleaned up) (first citing *Synopsys, Inc. v. Mentor Graphics Corp.*, 814 F.3d 1309, 1322 (Fed. Cir. 2016); and then citing *Power Integrations, Inc. v. Lee*, 797 F.3d 1318, 1326 (Fed. Cir. 2015)).

The Court has previously determined that "conclusory statements" alone are insufficient and, instead, the finding must be supported by a "reasoned explanation." *Lee*, 277 F.3d at 1342, 1345. The Court has also explained that "it is not adequate to summarize and reject arguments without explaining why the PTAB accepts the prevailing argument." *In re Nuvasive, Inc.*, 842 F.3d 1376, 1383 (Fed. Cir. 2016).

Here, the Board failed to adequately articulate a motivation to combine Florance and Kennedy. The Board's entire motivation to combine discussion consists of two paragraphs summarizing the parties' positions but failing to articulate

any reason for its determination. For instance, in the first paragraph, the Board merely summarized the parties' arguments:

> Petitioner explains that a skilled artisan would have been motivated to include Florance's movable markers in Kennedy's search so that users could easily update location information "to more accurately represent the locations of the buildings" and thereby ensure that searches "encompass[] only the appropriate propert[y] within the defined geographic area." Pet. 18–19 [Appx78–79] (quoting [Appx1158] ¶ 627); *see* [Pet. at 36, Appx96]. Patent Owner argues that Petitioner's rationale for combining Kennedy and Florance is insufficient for several reasons. First, Patent Owner faults Petitioner for relying on passages in Florance related to accuracy because, Patent Owner contends, Florance deals with accuracy in pre-defined geographic-search areas, not in images. *See* PO Resp. 24–27 [Appx298–301]. Patent Owner also criticizes Petitioner's statement that "Kennedy describes [location information] as 'often' inaccurate," because "nowhere in Kennedy's specification does the term 'often' appear let alone any description that there is a need to 'update location information for a building' because it is 'often' inaccurate." *Id.* at 27–28 [Appx301–302].

Appx12–13 (FWD). In the second and final paragraph of its discussion, the Board rejected Pictometry's arguments and cited *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398 (2007):

> We disagree with Patent Owner because even if Florance addresses accuracy in pre-defined geographic-search areas rather than images, that does not undermine Petitioner's general contention that using Florance's method (i.e., moving a marker from a preliminary position to a property's center) would ultimately improve accuracy and exclude unwanted properties in Kennedy's oblique images. Likewise, even if Kennedy never asserts that location information is often inaccurate, that does not undermine Petitioner's rationale because Petitioner's reason to combine references need not be explicit in the prior art. *See KSR*, 550 U.S. at 419. Given Petitioner's accuracy-improvement

> rationale, Petitioner has articulated sufficient reasoning with rational underpinning to support its assertion that including Florance's movable markers in Kennedy's system would have been obvious to one skilled in the art. *See id.* at 418, 419.

Appx13 (FWD). But the Board does not explain why one skilled in the art would have been motivated to combine Kennedy and Florance.

On the contrary, the Board's finding of a motivation to combine Kennedy and Florance is not supported by any "reasoned explanation." The entirety of the Board's explanation is found in a single, conclusory sentence: "Given [Nearmap's] accuracy-improvement rationale, [Nearmap] has articulated sufficient reasoning with rational underpinning to support its assertion that including Florance's movable markers in Kennedy's system would have been obvious to one skilled in the art." Appx13. This single statement that does not refer to any record evidence or even the parties' briefing is not a sufficient "reasoned explanation" to allow meaningful judicial review of the Board's finding. *See Lee*, 277 F.3d at 1342, 1345.

Additionally, the Board's Decision summarizes the parties' arguments and rejects Pictometry's argument without explaining why the Board accepts Nearmap's argument. The Board's statement that "[g]iven [Nearmap's] accuracy-improvement rationale, [Nearmap] has articulated sufficient reasoning with rational underpinning to support its assertion that including Florance's movable markers in Kennedy's system would have been obvious to one skilled in the art" does not

explain why the Board accepts Nearmap's argument. This Court has held such conclusory statements inadequate. *See Nuvasive*, 842 F.3d at 1384 (vacating the Board's obviousness determinations where "[t]he majority of the PTAB's analysis was limited to summaries of the parties' arguments" and the Board neither expressly adopted the petitioner's arguments regarding motivation to combine nor provided reasoned explanations for crediting the arguments); *see also Cutsforth, Inc. v. MotivePower, Inc.*, 636 F. App'x 575, 578 (Fed. Cir. 2016) (non-precedential) (holding that the Board failed to provide an adequate record where the "majority of [its] Final Written Decision is spent summarizing the parties' arguments and offers only conclusory analysis of its own"). Here, the Board's analysis does not cite to any evidence or portions of the briefing that it found persuasive. *See* Appx13; *Pers. Web Techs.*, 848 F.3d at 993–94 (vacating where the Board did "not cite, let alone explain or analyze or adopt, an earlier portion of [the] petition that refers to" the relevant passages of the prior art, and "nowhere clearly explained, or cited evidence showing, how the combination of the two references was supposed to work" in finding a motivation to combine the references). Although the Board's analysis includes the statement "[g]iven [Nearmap's] accuracy-improvement rationale . . .," this statement merely references Nearmap's accuracy-improvement rationale, *without* expressly adopting it.

Accordingly, the Board failed to articulate a sufficient motivation to combine Kennedy and Florance to allow for meaningful judicial review under the APA. The Board's Decision should be vacated and remanded for additional findings and explanation regarding whether a skilled artisan would have been motivated to combine Kennedy and Florance.

### B. The Board's prior art analysis is inconsistent with its claim construction analysis.

In analyzing whether the prior art teaches "providing visual access to an aerial image . . . corresponding to said first location data" (limitation [1.2]) and "providing visual access to one or more oblique images . . . corresponding to location coordinates of the final location" (limitation [1.5]), the Board found that "although claims 1 and 16 recite two separate 'providing visual access' steps, they do not recite any database-access steps." Appx9–10 (FWD). This statement contains a critical, substantive inconsistency with the Board's claim construction analysis that, according to the Court's recent case law, prevents the Court from determining whether substantial evidence supports the Board's finding that the prior art discloses the "providing visual access to one or more oblique images . . . corresponding to location coordinates of the final location" limitation in independent claims 1 and 14 under both the Board's construction and Pictometry's construction. For this

separate reason, the Court should vacate and remand for further explanation as to this limitation.

Specifically, this Court has held that an error in the Board's decision can preclude the Court from determining that substantial evidence supports the Board's findings. In *Corephotonics, Ltd. v. Apple Inc.*, 84 F.4th 990, 1012–13 (Fed. Cir. 2023), the Board's final written decision found that a prior art reference was analogous art because it was related to "cameras that have different *fields of view*." (emphasis in original). The Board's statement, however, was "incorrect." *Id.* at 1013. The prior art reference did ***not*** disclose cameras with different *fields of view*, but was instead "addressed to cameras with different *points of view*." *Id.* (emphasis in original). Apple argued that reference to "fields of view" was simply a typographical error. *Id.* The Court disagreed, determining that it was unable to discern whether the Board's error was "merely typographical and harmless or, instead, a potentially-impactful error of substance," and was thus unable to conclude that substantial evidence supported the Board's conclusion that the prior art reference was analogous to the challenged patents. *Id.*

Here, the Board's finding that "claims 1 ***and 16*** . . . do not recite any database-access steps" is substantively wrong and inconsistent with the Board's claim construction analysis. Indeed, claim 16 expressly recites a database access step in the

limitation "use said latitude and longitude coordinates to ***access imagery from the second imagery database***." Appx49 ('880 patent), 15:16–20 (emphasis added). Further, the Board recognized that nearly identical claim language in claim 3 recites a database access step in its claim construction analysis and based its claim construction analysis on that very distinction. Specifically, similar to claim 16, claim 3 recites: "using said latitude and longitude coordinates to ***access imagery from the second imagery database***." Appx48 ('880 patent), 14:20–21 (emphasis added). In analyzing claim construction, the Board stated that "claim 3 ***expressly recites the database-access step*** [Pictometry] seeks to add to claim 1[.]" Appx6 (FWD) (emphasis added). The Board's statement that "claims 1 ***and 16*** . . . do not recite any database-access steps" is thus substantively wrong and inconsistent with its prior claim construction analysis, where it determined that the claim language in claim 16 "expressly recites the database-access step." *See* Appx6, Appx10.

The Board's finding that "claims 1 and 16 . . . do not recite any database-access steps" prevents proper review of whether the Board correctly applied its construction and whether substantial evidence supports the Board's finding that the prior art discloses the "providing visual access to one or more oblique images . . . corresponding to location coordinates of the final location" limitation in claims 1 and 14 under the Board's adopted construction. The Board construed this

limitation to "require[] only displaying . . . images that have come from an aerial image database." Appx5. Yet the Board's analysis of whether the prior art discloses this limitation refers to "claims 1 and 16," where claim 16 ***expressly recites a database-access step***. Appx10 (FWD); *see* Appx49 ('880 patent, claim 16). Given the substantive error and inconsistency with its prior claim construction analysis, the Board's subsequent finding allegedly under its construction that "[Nearmap]'s proposed combination—Kennedy's Figure 35 vertical image, followed by Florance's marker movement and Kreft's confirmation, producing Kennedy's Figure 36 oblique image, *see* [Appx77–78, Appx97]—would provide both visual-access steps" is fundamentally flawed. Appx10 (FWD).

The Board's inconsistent reference to and analysis of "claims 1 and 16" is not a harmless error in view of its alternative finding that Nearmap's proposed combination is sufficient even under Pictometry's proposed construction requiring access and retrieval of an image from the aerial image database. Appx5, Appx10 (FWD). Claim 16 recites additional limitations beyond accessing a database: it also requires "***us[ing] said latitude and longitude coordinates*** to access imagery from the second imagery database." Appx49 ('880 patent), 15:16–20 (emphasis added). The Board's analysis under Pictometry's proposed construction, however, does not

address these additional latitude and longitude limitations in claim 16. The entirety of the Board's analysis under Pictometry's proposed construction states:

> Second, we agree with Petitioner that its combination is sufficient even under Patent Owner's proposed construction. *See* Pet. Reply 10–12 [Appx363–365]. Specifically, Petitioner's rationale for combining the references (i.e., improving accuracy, *see* Pet. 18–20 [Appx78–80]) explains why one skilled in the art would have retrieved Kennedy's two images in separate steps, separated by a user's confirmation. *Id.*; *see* Pet. 37 [Appx97] (describing the sequence). Patent Owner's argument, in contrast, assumes a skilled artisan could do no more than bodily incorporate Kennedy's single image-retrieval step. That, however, is not the test for obviousness. *See, e.g., Allied Erecting & Dismantling Co. v. Genesis Attachments, LLC*, 825 F.3d 1373, 1381 (Fed. Cir. 2016); *see also KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007) (noting that "a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ").

Appx10–11 (FWD). This analysis fails to recognize—let alone address—that claim 16 includes additional limitations of *using latitude and longitude* to access imagery from the second imagery database.

Although the Board later mentions claims 3 and 16 (Appx11 n.6), the Board's subsequent discussion does not cure the deficiency in the Board's failure to address claim 16's requirement of using latitude and longitude to access imagery. Indeed, the Board's subsequent analysis of claims 3 and 16 is also flawed because it only focuses on a second image retrieval step:

> Patent Owner asserts this same single-image-retrieval-step deficiency in Kennedy is fatal to Petitioner's obviousness challenge to dependent claims 3 and 16, which require "using . . . latitude and longitude

> coordinates to access imagery from the second imagery database." PO Resp. 19–20 [Appx293–294]. We disagree because, as explained above, ***Petitioner's asserted combination and rationale adequately account for a second image retrieval step***.

Appx11 n.6 (FWD) (emphasis added). The Board does not make any findings related to using latitude and longitude to access images. *See* Appx11 n.6; *see infra* Argument § II.A. The Board's differentiation between the independent and dependent claims for claim construction purposes while lumping those claims together in the obviousness analysis and the failure to address the additional step of using latitude and longitude to access images renders the Board's Decision contradictory and unreviewable. Because the Board's findings with respect to claims 3 and 16 are also flawed, the Board's reference to "claims 1 and 16" is not a harmless error.

Because the Board made a critical, substantive error in determining that the prior art discloses the "providing visual access to one or more oblique images . . . corresponding to location coordinates of the final location" limitation in claims 1 and 14 under both the Board's construction and Pictometry's construction, the Board's findings cannot properly be reviewed. The Court should thus vacate and remand for correction as to this limitation.

### C. The Board incorrectly construed the "providing visual access" limitation to mean displaying.

Even if the Cout does not set aside the Board's Decision due to its inadequate and inconsistent reasoning, the Court should set aside the Decision because the Board erred in construing the limitation "providing visual access to one or more oblique images of an aerial imagery database corresponding to location coordinates of the final location" (limitation [1.5]) to "require[] only displaying." Appx5 (FWD). Consistent with the claim language, specification, and prosecution history, the Board should have construed limitation [1.5] to mean "accessing an aerial imagery database to retrieve the one or more oblique images corresponding to location coordinates of the user-accepted final location and displaying the one or more oblique images retrieved from the aerial imagery database." Substantial evidence does not support the Board's finding that the prior art discloses this limitation even under Pictometry's construction. *See* Appx10–11.

#### 1. The Board erred in construing the "providing visual access" limitation to require only "displaying."

The correct construction for the limitation "providing visual access to one or more oblique images of an aerial imagery database corresponding to location coordinates of the final location" (limitation [1.5]) is "accessing an aerial imagery database to retrieve the one or more oblique images corresponding to location coordinates of the user-accepted final location and displaying the one or more

oblique images retrieved from the aerial imagery database." This construction is supported by the plain language of the claims, specification, and prosecution history, and is not precluded by claim differentiation.

**a. The claims are ordinal and require two "providing visual access" steps.**

The plain language of claim 1 requires the limitations to be performed in a specific order. Claim 1 requires two "providing visual access" steps, where the second "providing visual access" step occurs after user-acceptance of the final location of the visual marker. The relevant limitations of claim 1 recite:

> [1.2] ***providing visual access to an aerial image*** of a region including the roof structure of the building ***corresponding to said first location data*** . . .;
>
> [1.3] ***on the aerial image*** of the region, ***providing a visual marker that is moveable*** on a computer monitor . . . ***to a final location*** on top of the building to more precisely identify the location of the building roof structure, ***the final location having location coordinates***;
>
> [1.4] providing a computer input capable of signaling ***user-acceptance of the final location of said marker***; and,
>
> [1.5] providing visual access to one or more oblique images of an aerial imagery database ***corresponding to location coordinates of the final location***.

Appx48 (emphasis added).

Steps of a method claim should be construed to require an order "when the method steps implicitly require that they be performed in the order written."

*Interactive Gift Exp., Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1342 (Fed. Cir. 2001) (citing *Loral Fairchild Corp. v. Sony Corp.*, 181 F.3d 1313, 1322 (Fed. Cir. 1999)). In *Mantech Environmental Corp. v. Hudson Environmental Services, Inc.*, 152 F.3d 1368, 1375–76 (Fed. Cir. 1998), the Court construed claimed steps to be sequential where "the sequential nature of the claim steps is apparent from the plain meaning of the claim language and nothing in the written description suggests otherwise." Similarly, in *Wi-Lan, Inc. v. Apple, Inc.*, 811 F.3d 455, 462 (Fed. Cir. 2016), the Court held that the claims must have been performed in a certain order because the claim limitations used definite articles "the" and "said" to refer back to the same term recited earlier in the claim, and this ordering requirement was consistent with the specification.

Here, the plain language of the claims requires the limitations to be performed in a specific order. In limitation [1.2], the method "provid[es] visual access to ***an aerial image***." Limitation [1.3] refers back to the aerial image of limitation [1.2] and introduces a new limitation of a final location having location coordinates, reciting "on ***the aerial image*** of the region, providing a visual marker that is moveable on a computer monitor . . . to ***a final location*** on top of the building to more precisely identify the location of the building roof structure, ***the final location having location coordinates***." Limitation [1.4] then refers back to the final location of limitation [1.3],

reciting "providing a computer input capable of signaling user-acceptance of ***the final location*** of said marker." Finally, limitation [1.5] refers to limitations [1.3] and [1.4]: "providing visual access to one or more oblique images of an aerial imagery database corresponding to ***location coordinates of the final location***." Because the steps of the process in claim 1 recite a sequence where each step refers back to a previous limitation, the claims should be construed to require an order where the "providing visual access to an aerial image" in limitation [1.2] occurs before the "providing visual access to one or more oblique images" of limitation [1.5].

This understanding of the plain language of claim 1 is consistent with the specification. When the specification describes the process of the invention, it explains: (1) a user enters an address to retrieve an image from an imagery database and the computer screen may "depict imagery 502 of a region, the region including building 500 with its roof structure 501," Appx46, 9:53–64, Appx24–25, Figs. 4A–4B; (2) a marker is displayed on the image and "the customer or other user may be allowed to move the marker (by clicking and dragging via computer mouse, arrows, or otherwise) to a final location 106b," Appx46, 10:2–9, Appx26, Fig. 4C; (3) "when said marker has been moved to final location 106b, the user may activate a selection confirmation, such as confirm selection button 104, enter, checkbox or otherwise," and latitude and longitude coordinates are generated for the final

location of the marker confirmed by the user, Appx46, 10:12–15, 10:47–51, Appx26, Fig. 4C; and (4) the latitude and longitude coordinates may be used to "access imagery from a second imagery database" to generate "memory outline drawings . . . based on tracing imagery from said second imagery database," Appx47, 11:1–7. The specification does not disclose any other sequence of performing the claimed process. Moreover, the specification explains why this order is significant—"by translating the street address stated in longitude and latitude, it is easier to correlate to the second database." Appx46, 10:63–65. In this regard, the translation from an address to longitude and latitude coordinates ensures that the most accurate image is obtained from the second imagery database, which in turn ensures more accurate measurements.

Accordingly, the plain language of the claims, as supported by the specification, requires the two "providing visual access" steps to be performed in a specific order, such that the second "providing visual access" step in limitation [1.5] occurs after the first "providing visual access" step in limitation [1.2] and after user-acceptance of the final location of the visual marker.

#### b. "Providing visual access" requires access and visual depiction.

In addition to a second "providing visual access" step (limitation [1.5]) that occurs after a first "providing visual access" step (limitation [1.2]), the term

"providing visual access" itself refers to both access and visual depiction. Although the Board concluded that "nothing in the term's plain language requires accessing a database," (Appx6 (FWD)), the Board's construction is inconsistent with the specification, which uses different terms for the concept of both access and visual depiction (i.e., "providing visual access") and the concept of only displaying (i.e., "visually depicting").

A skilled artisan would have understood the term "providing visual access" to mean "accessing" (i.e., obtaining or retrieving) from the claimed aerial imagery database based on the location coordinates of the final location and visually depicting (i.e., displaying) in view of the specification's disclosure. The specification does not equate "visual access" with only visually depicting or displaying an image. The specification provides a definition for the term "visually depicting" to mean "show or illustrate something on a computer monitor as a graphical image."Appx44, 5:13–14 ('880 patent). The definition for "visually depicting" is synonymous with the Board's construction—"displaying"—yet the claims do ***not*** use this term in the claim language. That Pictometry provided a definition for the concept of "displaying" through its express definition of "visually depicting," but chose not to use this language in the claims, signifies that "visual access" does not mean merely "displaying" as construed by the Board.

Moreover, the sole use of the word "access" in the "Detailed Description" refers to something that is obtained or retrieved. In explaining the significance of the invention's use of latitude and longitude coordinates, the "Detailed Description" explains that a street address entered into a street address look up field is translated to latitude and longitude coordinates. Appx46, 10:63–67. Then, the latitude and longitude coordinates are used to "***access imagery*** from a second imagery database, such as for example Pictometry's database." Appx47, 11:1–3 (emphasis added). The use of the word "access" in this context refers to obtaining or retrieving the image, not displaying it. Given that the sole use of the word "access" in the "Detailed Description" refers to obtaining or retrieving an image, it follows that the term "providing visual access" in claims 1 and 14 would incorporate this concept of obtaining or retrieving an image.[1]

[1] Arguments based on the intrinsic evidence to support a construction of "providing visual access" that Pictometry has consistently argued to the Board may be considered by the Court. *Interactive Gift Exp.*, 256 F.3d at 1347 ("[W]e hold that arguments that are based on a specification in evidence and that are in support of an existing claim construction are not barred by the doctrine of waiver for the sole reason that they were not first presented to the trial court."); *Seabed Geosolutions (US) Inc. v. Magseis FF LLC*, 8 F.4th 1285, 1289 (Fed. Cir. 2021) (rejecting contention that arguments based on the prosecution history were waived because "[t]he doctrine of waiver does not preclude a party from supporting its original claim construction with new citations to intrinsic evidence of record." (citing *Interactive Gift Exp.*, 256 F.3d at 1346)).

In view of the absence of the term "visually depicting"—the term the specification adopts for the concept of "displaying"—as well as the context of the word "access" in the specification, a skilled artisan would have understood the term "providing visual access" to include both accessing an image and visual depiction of the image.

**c. The prosecution history supports a construction including access and visual depiction.**

The prosecution history supports construing "providing visual access" to include accessing images and not merely displaying images. During prosecution of the '880 patent's parent, the '222 patent, a substantially similar limitation was added to independent claim 1 of the '222 patent. In particular, the limitation "[p]roviding visual access to one or more images of an aerial imagery database corresponding to location coordinates of the final location" was added to the pending claims. Appx2448, 14:11–13 ('222 patent), Appx2517 ('222 patent PH). This limitation is identical to limitation [1.5] at issue in the '880 patent, except limitation [1.5] requires "oblique images" of an aerial imagery database. *Compare* Appx2448, 14:11–13 ('222 patent, claim 1), Appx2517, *with* Appx48, 14:6–8 ('880 patent, claim 1).

In its Remarks submitted with the claim amendments, Pictometry explained that the amended claims were distinguishable over the cited prior art because the prior art retrieved images and then performed image registration using registration

marker controls. Appx2522–2526 ('222 patent PH). Pictometry repeatedly characterized the amendment as being directed to "***providing access*** to one or more images of an aerial imagery database corresponding to location coordinates of the final location." Appx2523 (emphasis added); *see also* Appx2525 ("[F]inal placement of the registration markers, as described by Pershing, does not ***provide access*** to one or more images corresponding to location coordinates of the final location as set forth in claim 23"). In other words, the prosecution history indicates that the amended language of "providing visual access to one or more images of an aerial imagery database" means providing access to images. Thus, the prosecution history of the '222 patent supports interpreting "providing visual access" to include accessing images.

The prosecution history of the '222 patent is relevant to the nearly identical limitation in this patent. "When multiple patents derive from the same initial application, the prosecution history regarding a claim limitation in any patent that has issued applies with equal force to subsequently issued patents that contain the same claim limitation." *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 980 (Fed. Cir. 1999); *see also Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.*, 265 F.3d 1294, 1305 (Fed. Cir. 2001) ("The prosecution history of a related patent can be relevant if, for example, it addresses a limitation in common with the patent in

suit."); *Augustine Med., Inc. v. Gaymar Indus., Inc.*, 181 F.3d 1291, 1300 (Fed. Cir. 1999) ("[T]he prosecution history of a parent application may limit the scope of a later application using the same claim term[.]"). Here, the '880 and '222 patents share the same specification because the '880 patent is a continuation of the '222 patent. Moreover, both the '880 and '222 patents include nearly identical "providing visual access" limitations. *Compare* Appx48, 14:6–8 ('880 patent, claim 1), *with* Appx2448, 14:11–13 ('222 patent, claim 1), Appx2517. Accordingly, the prosecution history of the '222 patent is relevant to understanding the meaning of the "providing visual access" limitation in the '880 patent.

Thus, the prosecution history of the '222 patent supports construing the "providing visual access" limitation in the '880 patent to include accessing images.

#### d. Claim differentiation does not exclude accessing a database from "providing visual access."

In construing "providing visual access" to mean "displaying," the Board stated that "[t]he doctrine of claim differentiation undermines [Pictometry's] construction because dependent claim 3 expressly recites the database-access step [Pictometry] seeks to add to claim 1, which does not have that language." Appx6 (FWD). The Board failed to consider that claim 3 recites additional limitations, such that the database access step is not the *sole* difference between claims 1 and 3 to preclude construing "providing visual access" from including "accessing" based on

principles of claim differentiation. The Board's errors apply equally to claims 14 and 16, which contain substantively identical limitations to claims 1 and 3.

"The doctrine of claim differentiation is at its strongest . . . where the limitation that is sought to be read into an independent claim already appears in a dependent claim." *InterDigital Commc'ns, LLC v. Int'l Trade Comm'n*, 690 F.3d 1318, 1324 (Fed. Cir. 2012) (internal quotations and citations omitted). Claim differentiation is applicable "when there is a dispute over whether a limitation found in a dependent claim should be read into an independent claim, ***and that limitation is the only meaningful difference between the two claims***." *Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001) (emphasis added). Here, claim differentiation does ***not*** preclude "providing visual access" from including an access step because a database access step is not the only meaningful difference between claims 1 and 3.

Limitation [1.5] recites "providing visual access to one or more oblique images of an aerial imagery database corresponding to location coordinates of the final location." Appx48 (claim 1). Claim 2, which depends on claim 1, further defines the "first location data" in limitation [1.1] and recites an additional step to the process in claim 1: "wherein said first location data comprised street address data, and wherein said location coordinates of said final location are translated to latitude and

longitude coordinates." Appx48 (claim 2). Claim 3, which depends on claim 2, specifies the use of two databases in the process of claim 1, and ties the additional step of claim 2 to the process of claim 1:

> The process of claim 2 and wherein said image corresponding to the first location data is from a first imagery database from which said final location is selected and is internet-based imagery having a corresponding street address look up field, and wherein the aerial imagery database is a second imagery database, and further comprising the act of:
>
> using said latitude and longitude coordinates to access imagery from the second imagery database.

Appx48 (claim 3). Thus, claim 3 adds multiple additional limitations to claim 1, not just a database access step as determined by the Board. *See* Appx6 (FWD).

With respect to the database access step specifically, claim 3 does *not* merely provide a database access step that is not present in claim 1. Instead, claim 3 provides for "using said latitude and longitude coordinates" from claim 2 "to access imagery from the second imagery database." If the sole difference between claims 1 and 3 was a database access step as determined by the Board, the language of claim 3 would be different. For example, it might say "wherein the step of providing visual access to one or more oblique images of an aerial imagery database corresponding to location coordinates of the final location includes accessing the aerial imagery database." Instead, claim 3 provides additional details as to the number of databases used,

specifies that the aerial imagery database corresponds to a second imagery database, and ties the additional step from claim 2 to the process of claim 1. As such, claim 3 provides meaningful differences to claim 1 beyond a database access step, such that claim differentiation does not support excluding the database access concept from claim 1. *See Laitram, LLC v. Ashworth Bros., Inc.*, No. 2022-1044, 2023 WL 3449148, at *4 (Fed. Cir. May 15, 2023) (non-precedential) (declining to apply claim differentiation where there was "more than one meaningful difference" between the claims).

* * *

In view of the claim language, specification, and prosecution history, the Court should construe the limitation "providing visual access to one or more oblique images of an aerial imagery database corresponding to location coordinates of the final location" (limitation [1.5]) to mean "accessing an aerial imagery database to retrieve the one or more oblique images corresponding to location coordinates of the user-accepted final location and displaying the one or more oblique images retrieved from the aerial imagery database."

### 2. Substantial evidence does not support the Board's finding that the prior art discloses limitation [1.5] under the correct construction.

The Board found that the combination of Kennedy, Florance, and Kreft discloses the limitation "providing visual access to one or more oblique images of an aerial imagery database corresponding to location coordinates of the final location" (limitation [1.5]) even under Pictometry's construction. Specifically, the Board "agree[d] with [Nearmap] that its combination is sufficient even under [Pictometry's] proposed construction" because "[Nearmap's] rationale for combining the references (i.e., improving accuracy, *see* Pet. 18–20 [Appx78–80]) explains why one skilled in the art would have retrieved Kennedy's two images in separate steps, separated by a user's confirmation. *Id.*; *see* Pet. 37 [Appx97] (describing the sequence)." Appx10 (citing Appx363–365 (Pet. Reply)). Under Pictometry's correct construction requiring "accessing an aerial imagery database to retrieve the one or more oblique images corresponding to location coordinates of the user-accepted final location and displaying the one or more oblique images retrieved from the aerial imagery database," substantial evidence does not support the Board's finding.

There is no substantial evidence supporting a finding that the combination of references teaches a second image access step that retrieves images corresponding

to location coordinates of a final location after user acceptance of the final location. The combination of references simply does not contemplate this particular second image access step. The Board's Decision adopts Nearmap's arguments in its Reply. Appx10 (FWD) (citing Appx363–365 (Pet. Reply)). In Nearmap's proposed combination, the only reference that discloses image access from a database is Kennedy. *See* Appx363–365. Indeed, Nearmap only relies on Florance for repositioning an icon and Kreft for calculating new GPS coordinates for the repositioned icon. Appx363.

There is no substantial evidence supporting the Board's finding that Kennedy discloses a second image access step to obtain oblique aerial images corresponding to location coordinates of a user-accepted final location after the system retrieves and presents a vertical aerial image of a building. Kennedy only discloses a single image access step to retrieve aerial images and oblique images. Although Nearmap's Reply cited to various portions of Kennedy (Appx363–365 (Pet. Reply) (citing Appx934, Appx950–951, Appx955, Appx965, 5:36–50, 6:32–67, 25:27–31, 25:64, 26:36–52, FIGS. 1, 36–37)), none of these sections describe the recited second image access step. At best, these cited portions only describe a single image access step to obtain both aerial and oblique images.

Kennedy explains that, after a user provides an address of a user-selected site, "system 100 retrieves an image of the location from a source of images such as geophysical database 109. System 100 provides a retrieved image 153 of the user selected site based on the location information provided by the user." Appx955, 5:41–51. Kennedy describes one embodiment where "image retrieval subsystem 110 is configured to receive a first image 153 comprising a plan view of the roof and a second image 154 comprising a perspective view of the roof." Appx955, 6:63–67. Although Kennedy discloses retrieving both a "plan view" and a "perspective view," both these images are retrieved in a single access step. *See* Appx955, 5:41–51, 6:63–67.

Kennedy also describes embodiments where "a plurality of different perspective views are obtained. A model obtained using a top plan view is used on each perspective view to size the roof. The greater the number of perspective views used to obtain roof pitch information, the more accurate the resulting measurement of roof pitch." Appx965, 26:40–47. This embodiment is consistent with the specification's previous descriptions of a single access step where the top plan view is used to generate a model that is then used on "each perspective view." *See* Appx965, 26:40–47. Thus, Nearmap's cited portions only describe a single image access step to obtain both aerial and oblique steps.

Nearmap's Reply also asserted:

> [A] POSITA would have understood that, in the Kennedy-led combination, "after obtaining the vertical aerial image . . . and after the GPS coordinates for the geocoded address . . . are updated," the computer system that results from the combination "would use the updated coordinates to retrieve the oblique aerial image . . . from a GIS database such as 'Microsoft, Google [Earth], or any of a number of other commercially available databases,'" (Petition, 37 [Appx97]), "and present[] the one or more oblique aerial images," (Petition, 34 [Appx94]).

Appx363–364. Nearmap's assertion, however, is simply not contemplated by the prior art. The prior art does not suggest two database access steps, where the second database access step occurs after updating GPS coordinates.

Because the Board's finding that the prior art discloses the limitation "providing visual access to one or more oblique images of an aerial imagery database corresponding to location coordinates of the final location" (limitation [1.5]) is not supported by substantial evidence, the Court should vacate and remand the Board's Decision.

* * *

Because the Board's analysis of claims 1 and 14 fails to provide adequate explanation, is inconsistent between its claim construction and prior art analysis, and is unsupported by substantial evidence under the correct claim construction, the Board's Decision regarding claims 1 and 14 should be vacated and remanded.

## II. The Board's analysis of dependent claims 3 and 16 contains inadequate explanation and is internally inconsistent.

The Board's inadequate explanations and inconsistent analysis were not isolated to independent claims 1 and 14. Indeed, the Board barely mentions the dependent claims, referring to dependent claims 3 and 16 in a single irreconcilable footnote. Like the Board's analysis for motivation to combine Kennedy and Florance, the Board failed to sufficiently articulate its reasoning for finding that the prior art discloses limitations 3 and 16. Additionally, the Board's prior art analysis of a limitation in claim 16 is inconsistent with its claim construction analysis of the same claim language. For each of these reasons, the Court should vacate and remand the Board's Decision with respect to claims 3 and 16.

### A. The Board violated the APA by failing to adequately explain why the prior art discloses all the limitations of claims 3 and 16.

The Board mentioned claims 3 and 16 in a single footnote consisting of two sentences:

> Patent Owner asserts this same single-image-retrieval-step deficiency in Kennedy is fatal to Petitioner's obviousness challenge to dependent claims 3 and 16, which require "using . . . latitude and longitude coordinates to access imagery from the second imagery database." PO Resp. 19–20 [Appx293–294]. We disagree because, as explained above, Petitioner's asserted combination and rationale adequately account for a second image retrieval step.

Appx11 n.6 (FWD). The Board's treatment of claims 3 and 16 is deficient under the APA because it fails to adequately explain the basis for finding these unique claims obvious and does not even address all the disputed limitations in claims 3 and 16.

First, the Board offers no "reasoned explanation" and does not explain why it accepted Nearmap's argument as to these claims. *Lee*, 277 F.3d at 1342, 1345; *Nuvasive*, 842 F.3d at 1383; *Cutsforth*, 636 F. App'x at 578. The entirety of the Board's analysis again comes down to a single sentence: "We disagree because, as explained above, [Nearmap]'s asserted combination and rationale adequately account for a second image retrieval step." Appx11 n.6. This statement, however, does not cite to any portion of the Board's Decision, the Petition, or any evidence to provide a "reasoned explanation" to allow meaningful judicial review of the Board's finding, nor explains why the Board accepts Nearmap's argument as to limitations 3 and 16. *See Lee*, 277 F.3d at 1342, 1345; *Nuvasive*, 842 F.3d at 1383; *Cutsforth*, 636 F. App'x at 578. Although the Board's statement references its discussion "explained above," the Board's discussion "above" referred to limitations that only appeared in independent claims 1 and 14. Appx9–11 (discussing "providing visual access" limitations), Appx11 n.6. The Board's reliance on its discussion "above" (referring to limitations in independent claims 1 and 14) for dependent claim 3 cannot be reconciled with its prior claim construction analysis stating that it interpreted

independent claim 1 and dependent claim 3 to have different claim scope based on claim differentiation.

More importantly, the Board's analysis completely fails to address the limitations in claims 3 and 16 directed to "***using . . . latitude and longitude coordinates*** to access imagery from the second imagery database." Appx48–49 ('880 patent, claims 3 and 16). At best, the Board's statement that "[Nearmap]'s asserted combination and rationale adequately account for a second image retrieval step" only addresses the second image retrieval aspect of claims 3 and 16—"access imagery" from the second imagery database. Appx11 n.6 (FWD), Appx48–49 ('880 patent, claims 3 and 16). It says nothing about ***using latitude and longitude coordinates*** to access the imagery from the database, despite the parties' dispute regarding whether the prior art disclosed this limitation. Appx293–294 (PO Resp.), Appx365–366 (Pet. Reply). Accordingly, the Board's analysis fails to adequately explain how the prior art discloses the latitude and longitude coordinates aspect of claims 3 and 16. The Board's findings regarding this limitation are not supported by ***any*** evidence, let alone substantial evidence.

Because the Board failed to adequately explain the basis for its determination of obviousness with respect to *all* limitations of claims 3 and 16, the Court should vacate and remand the Board's Decision for further findings and explanation.

**B. The Board's analysis of dependent claims 3 and 16 for claim construction and prior art are internally inconsistent.**

The Board's treatment of claims 3 and 16 also suffers from an internal inconsistency. Indeed, in its claim construction analysis, the Board distinguished limitations in claims 3 and 16. Yet, in its obviousness determination, it lumped the dependent claims in with the independent claims. Such inconsistent reasoning further calls for the Decision to be vacated and remanded.

This Court has previously found that an administrative agency's finding is not supported by substantial evidence when the agency's claim interpretation and factual findings are internally inconsistent. In *Linear Technologies Corp. v. International Trade Commission*, the Court vacated and remanded the Commission's finding that certain products did not infringe a claim because the Commission's analysis of claim scope and analysis for noninfringement were internally inconsistent. 566 F.3d 1049, 1064–65 (Fed. Cir. 2009) (discussing claim 34). In particular, the Court found that substantial evidence did not support the Commission's finding of noninfringement because, when considering claim scope, the Commission determined that the claim did ***not*** require a specific limitation—a "third circuit[] and . . . second control signal[]." *Id.* at 1065. But in considering noninfringement, "[t]he only . . . possible explanation" for the Commission's finding of noninfringement was because the products "[did] not meet the 'third

circuit' or 'second control signal' limitations." *Id.* In other words, the Commission determined that the claim did ***not*** require two claim elements, but then found noninfringement based on the absence of ***the same two claim elements*** in the accused products. The Commission's noninfringement finding was internally inconsistent because "[the] omissions [of a limitation not required by the claims] cannot be the basis for a finding of noninfringement." *Id.* Accordingly, the Court determined that the Commission's finding of noninfringement was not supported by substantial evidence. *Id.*

Like in *Linear Technologies*, the Board's Decision here is also internally inconsistent. In considering claim construction, the Board determined that claim 1 did not include a database-access limitation under the doctrine of claim differentiation because "dependent claim 3 expressly recites the database-access step [Pictometry] seeks to add to claim 1, which does not have that language." Appx6. In other words, the Board found that under claim differentiation, claim 3 contained additional limitations that were not present in claim 1. But when addressing claim 3 for obviousness, the Board did not make any findings that were separate from claim 1. The Board only stated: "We disagree because, as explained above, [Nearmap]'s asserted combination and rationale adequately account for a second image retrieval step." Appx11 n.6 (FWD). Although the Board did not

expressly cite to a specific part of its Decision, this statement presumably refers to the Board's discussion of the "providing visual access" limitation, which only appears in claims 1 and 14. Appx9–11 (FWD). The Board's treatment of claim 3 for claim construction, where it determined claim 3 had additional limitations not present in claim 1, is internally inconsistent with its factual findings of claim 3 for obviousness, which entirely relies on its discussion of limitations that only appear in claims 1 and 14 and does not make any factual findings related to the additional limitations in claim 3. *Compare* Appx5–6 (discussing claim construction), *with* Appx11 n.6 (discussing factual findings).

The Board's inadequate analysis for claim 3 also applies to claim 16, which contains identical limitations to claim 3. *See supra* Argument § I.B. As in *Linear Technologies*, the Board's findings with respect to claims 3 and 16 are therefore not supported by substantial evidence because they are inconsistent with the Board's claim construction analysis for the same claims. *Accord Honeywell Int'l Inc. v. Mexichem Amanco Holding S.A. De C.V.*, 865 F.3d 1348, 1354 (Fed. Cir. 2017) (finding the Board's analysis flawed due to internal inconsistencies in analyzing inherent properties in motivation to combine and secondary considerations); *see also Polygroup Ltd. MCO v. Willis Elec. Co., Ltd.*, 780 F. App'x 880, 883–84 (Fed. Cir. 2019) (non-precedential) (concluding that internally inconsistent findings were not

supported by substantial evidence); *Hitachi Metals, Ltd. v. All. of Rare-Earth Permanent Magnet Indus.*, 699 F. App'x 929, 936 (Fed. Cir. 2017) (non-precedential) (explaining that remand would have been warranted for internally inconsistent reasoning had the Board not made additional fact findings).

Because the Board's discussion of dependent claims 3 and 16 is internally inconsistent between claim construction and obviousness, substantial evidence does not support the Board's findings for claims 3 and 16. The Court should vacate the Board's Decision as to these claims and remand for further analysis.

## CONCLUSION

For the reasons above, Pictometry respectfully requests that this Court vacate the Board's Decision and remand for clarification of the Board's findings for the limitation "providing visual access to one or more oblique images of an aerial imagery database corresponding to location coordinates of the final location" and adequate explanation of the motivation to combine and dependent claims 3 and 16, as well as any other outstanding issues. Pictometry requests such additional and further relief to which it should be entitled.

Dated: June 4, 2024

Respectfully Submitted,

**HAYNES AND BOONE, LLP**

*/s/ Debra J. McComas*
Debra J. McComas
2801 N. Harwood St., Suite 2300
Dallas, Texas 75201
Phone: (214) 651-5575
*Debbie.McComas@haynesboone.com*

Gregory P. Webb
6000 Headquarters Drive, Suite 200
Plano, TX 75024
Phone: (972) 739-8641
*Greg.Webb@haynesboone.com*

Jonathan R. Bowser
Adam L. Erickson
800 17th Street, NW, Suite 500
Washington, DC 20006
Phone: (202) 654-4503
*Jonathan.Bowser@haynesboone.com*
*Adam.Erickson@haynesboone.com*

Laura N. Vu*
1 Post Street, Suite 2800
San Francisco, CA 94104
Phone: (415) 293-8930
*Laura.Vu@haynesboone.com*

**Admitted only to practice in District of Columbia and Maryland. Application to the California Bar is pending.*

**Attorneys for Appellant**
**Pictometry International Corporation**

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. Cir. R. 32(b)(1) because:

■ this brief contains **11,740** words, excluding the parts of the motion exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b)(2).

2. This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and 32(a)(6) because:

■ this brief has been prepared in a proportionally spaced typeface using Word for Microsoft 365 in 14-point Equity A font.

*/s/ Debra J. McComas*
Debra J. McComas

# ADDENDUM

| Tab | Document | Appx No. |
| --- | --- | --- |
| 1 | Final Written Decision in IPR2022-00733 | Appx1 – Appx19 |
| 2 | U.S. Patent No. 8,542,880 | Appx20 – Appx49 |

Trials@uspto.gov
571.272.7822

Paper 28
Entered: October 20, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

NEARMAP US, INC.,
Petitioner,

v.

PICTOMETRY INTERNATIONAL CORP.,
Patent Owner.

---

IPR2022-00733
Patent 8,542,880 B2

---

Before THOMAS L. GIANNETTI, GARTH D. BAER, and RUSSELL E. CASS, *Administrative Patent Judges*.

BAER, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

# I. INTRODUCTION

## A. BACKGROUND

Nearmap US, Inc. ("Petitioner") filed a Petition (Paper 2, "Pet."), requesting an *inter partes* review of claims 1–20 (the "challenged claims") of U.S. Patent No. 8,542,880 B2 (Ex. 1001, "the '880 patent"). Pictometry International Corp. ("Patent Owner") filed a Preliminary Response to the Petition. Paper 9. Pursuant to 35 U.S.C. § 314, we instituted this *inter partes* review as to all of the challenged claims and all grounds raised in the Petition. Paper 10. Following institution, Patent Owner filed a Response. Paper 14 ("PO Resp."). Petitioner filed a Reply to Patent Owner's Response (Paper 18, "Pet. Reply"), and Patent Owner filed a Sur-reply (Paper 23, "PO Sur-reply"). On August 8, 2023, we held an oral hearing. A transcript of the hearing is included in the record. Paper 27.

We have jurisdiction under 35 U.S.C. § 6. This decision is a Final Written Decision issued pursuant to 35 U.S.C. § 318(a). For the reasons we discuss below, we determine that Petitioner has proven by a preponderance of the evidence that the challenged claims are unpatentable.

## B. RELATED PROCEEDINGS

The '880 patent is at issue in *Eagle View Techs. v. Nearmap US*, 2-21-cv-00283 (D. Utah) and *Eagle View Techs. v. GAF Materials LLC*, DNJ-1-21-cv-10669 (D. NJ). Pet. 91; *see* Paper 6, 2. The '880 patent is also the challenged patent in IPR2016-00594. Pet. 91.

## C. REAL PARTIES IN INTEREST

Petitioner identifies itself as the only real party in interest. Pet. 90. Patent Owner identifies itself and Eagle View Technologies, Inc., as real parties in interest. Paper 3, 2.

## D. THE ’880 PATENT

The ’880 patent relates to a system for determining the attributes of a real-world three-dimensional building. Ex. 1001, Code (57). In one embodiment, first location data corresponding to the location of a building is input by a user, and visual access of an aerial image of a region including the roof structure of the building corresponding to the first location data is provided. *Id.* at 9:50–10:15, 11:9–16, Figure 3. A moveable visual marker, provided in the region corresponding to the first location, is capable of being moved to the top of the building to more precisely identify the location of the building roof structure. *See id*. The relocated visual marker acts as a final location with location coordinates. *See id*. The user accepts the visual marker’s final location, and one or more oblique images of an aerial imagery database corresponding to the location coordinates of the final location are provided to the user. *Id.* at 1:33–56.

## E. CHALLENGED CLAIMS

Petitioner challenges claims 1–20. Of the challenged claims, claims 1 and 14 are independent. Independent claim 1 is representative and is reproduced below:

> 1. A process for determining attributes of a roof structure of a real-world three-dimensional building, comprising the acts of:
>
> providing at least one computer input field for a user to input first location data generally corresponding to the location of the building;
>
> providing visual access to an aerial image of a region including the roof structure of the building corresponding to said first location data, the aerial image taken from a straight down overhead view with respect to the roof structure;

> on the aerial image of the region, providing a visual marker that is moveable on a computer monitor around said region, said visual marker initially corresponding to said first location data, wherein said visual marker may be moved to a final location on top of the building to more precisely identify the location of the building roof structure, the final location having location coordinates;
>
> providing a computer input capable of signaling user-acceptance of the final location of said marker; and
>
> providing visual access to one or more oblique images of an aerial imagery database corresponding to location coordinates of the final location.

Ex. 1001, 13:53–14:8.

### F. ASSERTED GROUNDS OF UNPATENTABILITY

Petitioner asserts the following grounds of unpatentability. Pet. 2.

| **Claims Challenged** | **(35 U.S.C. §)[1]** | **Reference(s)/Basis** |
|---|---|---|
| 1–20 | 103 | Kennedy[2], Florance[3], Kreft[4] |
| 1–3, 8–16, 20 | 103 | Keane[5], Florance, Kreft |
| 4–7, 17–19 | 103 | Keane, Florance, Kreft, Kennedy |

Petitioner also relies on a declaration from Dr. David Forsyth (Ex. 1003).

---

[1] Because the parties agree that the challenged claims of the challenged patent have an effective filing date before March 16, 2013, we apply the pre-AIA ("America Invents Act") version of § 103. Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284, 285–88 (2011).
[2] US 8,417,061 B2, Apr. 9, 2013 (Ex. 1004, "Kennedy").
[3] US 2009/0132316 A1, Pub. May 21, 2009 (Ex. 1005, "Florance")
[4] US 7,373,244 B2, May 13, 2008 (Ex. 1006, "Kreft").
[5] US 2008/0279452 A1, Pub. Nov. 13, 2008 (Ex. 1007, "Keane").

## II. PRELIMINARY MATTERS

### A. Level of Ordinary Skill

Petitioner contends a person of ordinary skill in the art at the time of the '880 patent "would have had at least a Bachelor's Degree in an academic area emphasizing the design of electrical, computer, or software technologies, or a similar discipline, and at least two years of experience related to computerized image analysis and three-dimensional modeling." Pet. 7. Further, "education could compensate for a deficiency in work experience, and vice-versa." *Id.* Patent Owner does not provide a formulation for a person of ordinary skill. We adopt Petitioner's description as it is consistent with the prior art and patent specification before us and supported by credible expert testimony. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001) (prior art itself may reflect an appropriate level of skill).

### B. Claim Construction

Patent Owner proposes that we construe the phrase "providing visual access to one or more oblique images of an aerial imagery database corresponding to location coordinates of the final location" in claims 1 and 14 to mean "accessing an aerial imagery database to retrieve the one or more oblique images corresponding to location coordinates of the user-accepted final location and displaying the one or more oblique images retrieved from the aerial imagery database." PO Resp. 9. Petitioner asserts that Patent Owner's construction is flawed because providing visual access does not require "accessing an aerial imagery database." Pet. Reply 3.

We agree with Petitioner. The plain meaning of the limitation at issue requires only displaying ("providing visual access") to images that have come from an aerial image database ("images of an aerial imagery

database"). As Petitioner notes, however, nothing in the term's plain language requires accessing a database. *Id.* Moreover, as Petitioner notes, the doctrine of claim differentiation undermines Patent Owner's construction because dependent claim 3 expressly recites the database-access step Patent Owner seeks to add to claim 1, which does not have that language. *Id.* at 5. *See, e.g., InterDigital Commc'ns, LLC v. ITC*, 690 F.3d 1318, 1324 (Fed. Cir. 2012) ("The doctrine of claim differentiation is at its strongest in this type of case, 'where the limitation that is sought to be "read into" an independent claim already appears in a dependent claim.'" (quoting *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004)). Thus, for the reasons above, we agree with Petitioner that the claimed "providing visual access to one or more oblique images of an aerial imagery database" step in claim 1 does not require accessing an aerial imagery database to retrieve the one or more oblique images.

### C. DESCRIPTION OF PRIOR ART REFERENCES IN GROUND 1

#### *1. <u>Kennedy (Ex. 1004)</u>*

Kennedy discloses a system for "determin[ing] the measurements of a roof." Ex. 1004, Code (57). Kennedy's Figure 35 is reproduced below.




FIG. 35

Figure 35 is "a top plan view of a roof . . . obtained from a geographical information service." *Id.* at 3:41–43.

Kennedy's Figure 36 is reproduced below.




FIG. 36

Figure 36 is "a perspective view of the roof" in Figure 35. *Id.* at 3:46–47.

*2. Florance (Ex. 1005)*

Florance discloses a system "for associating an aerial image with map features and information concerning objects appearing in the image." Ex. 1005, Code (57). Florance teaches that "a user looks at the image of the property in the aerial image and the position of [an] icon, determines a more accurate position for the icon, and moves the icon (e.g., by clicking and dragging) to [a] more accurate position." *Id.* ¶ 624.

*3. Kreft (Ex. 1006)*

Kreft describes methods for "locating points of interest [POIs]" on geographic maps. Ex. 1006, Code (57). Kreft explains that "[a] variety of symbols or icons are used to mark POI's on a map." *Id.* at 15:57–58. According to Kreft, users may move these POI markers and confirm the marker's new location via a dialog box. *Id.* at 18:13–14, 18:63–66.

## III. UNPATENTABILITY ANALYSIS

### A. OBVIOUSNESS OF CLAIMS 1–20 BASED ON KENNEDY, FLORANCE, AND KREFT

In its first asserted ground, Petitioner contends claims 1–20 would have been obvious over Kennedy, Florance, and Kreft. Pet. 8–59. For the reasons explained below, we find Petitioner has shown that claims 1–20 would have been obvious over the references by a preponderance of evidence.

*1. Petitioner's Proposed Combination*

Petitioner describes its proposed combination as follows:

> [A]n aerial image obtained using an entered address for a building in Kennedy is overlaid with a marker that represents the building and that is movable from a "preliminary position . . . [that]

> represents an approximate location of the property" containing the building to "[a] more accurate position . . . in the center of the property or the center of the building on the property," as described in Florance. After the marker that represents the building has been moved to the new location, the new location can be confirmed through a dialog box to update location information for the building such as a GPS coordinates of a "geocoded address" of the building, as described in Kreft. The updated location information, geocoded address using new GPS coordinates, is then used to obtain oblique aerial images, as described in Kennedy.

Pet. 17–18 (citations omitted).

Petitioner further explains that a skilled artisan

> would have been motivated and found it obvious to combine Kennedy and Florance to improve the utility of Kennedy's system by enabling users to easily update location information for buildings using movable markers in order to more accurately represent the locations of the buildings, and, thereby, "ensure[] that [aerial images obtained by] a geographically-based search . . . encompasses only the appropriate propert[y] within the defined geographic area" of the aerial images.

*Id.* at 18–19 (quoting Ex. 1006 ¶ 627). In addition, as Petitioner explains, a skilled artisan would have been motivated to "modify the combination of Kennedy and Florance based on the teachings of Kreft in order to provide users the ability to confirm or cancel updates to marker locations before location information for buildings is updated, thereby improving the accuracy of the stored location information." *Id.* at 22.

Patent Owner raises several arguments in contesting Petitioner's challenge. We discuss those arguments below.

*2. Providing Visual Access to Aerial and Oblique Images*

Independent claims 1 and 14 require "providing visual access to an aerial image . . . corresponding to said first location data" as well as

"providing visual access to one or more oblique images . . . corresponding to location coordinates of the final location." Ex. 1001, 13:59–14:8, 14:59–15:5. Petitioner asserts that Kennedy teaches this feature because it teaches "retriev[ing] aerial photographs of a building," Pet. 26, as well as "obtain[ing] . . . oblique aerial images (e.g., 'perspective views') of the building," *id.* at 34. Patent Owner asserts Kennedy is deficient because "Kennedy only discloses obtaining (or retrieving) images via a single image retrieval step" instead of "performing a second image retrieval step to obtain oblique aerial images ***after*** the system retrieves and presents a vertical aerial image of a building," as the claims require. PO Resp. 13; *see id.* at 15–20.

We disagree with Patent Owner's argument for two reasons. First, Patent Owner's argument relies on its construction of "providing visual access to one or more oblique images." We decline to adopt that construction for the reasons outlined above in Section II.B. In short, although claims 1 and 16 recite two separate "providing visual access" steps, they do not recite any database-access steps. Petitioner's proposed combination—Kennedy's Figure 35 vertical image, followed by Florance's marker movement and Kreft's confirmation, producing Kennedy's Figure 36 oblique image, *see* Pet. 17–18, 37—would provide both visual-access steps. Second, we agree with Petitioner that its combination is sufficient even under Patent Owner's proposed construction. *See* Pet. Reply 10–12. Specifically, Petitioner's rationale for combining the references (i.e., improving accuracy, *see* Pet. 18–20) explains why one skilled in the art would have retrieved Kennedy's two images in separate steps, separated by a user's confirmation. *Id.*; *see* Pet. 37 (describing the sequence). Patent Owner's argument, in contrast, assumes a skilled artisan could do no more than bodily incorporate Kennedy's single

image-retrieval step. That, however, is not the test for obviousness. *See, e.g.*, *Allied Erecting & Dismantling Co. v. Genesis Attachments, LLC*, 825 F.3d 1373, 1381 (Fed. Cir. 2016); *see also KSR Int'l Co. v. Teleflex Inc.,* 550 U.S. 398, 418 (2007) (noting that "a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ").

For these reasons, and in light of the Petition's analysis, *see* Pet. 27–37, we agree with Petitioner that its proposed combination teaches "providing visual access to an aerial image . . . corresponding to said first location data" as well as "providing visual access to one or more oblique images . . . corresponding to location coordinates of the final location."[6]

*3. Non-Transient Computer Memory*

Independent claim 14's preamble recites "[a] non-transient computer memory storing computer logic, that when executed by computer hardware causes the computer hardware to determine attributes of a roof structure of a real-world three-dimensional building." Ex. 1001, 14:49–52. Patent Owner asserts that Petitioner's Kennedy-based obviousness challenge to claims 14–20 fails because it does not address this non-transient-computer-memory feature, but instead relies on its earlier analysis that addresses claims without that feature. PO Resp. 20–23. We disagree with Patent Owner's argument.

First, it is clear that Kennedy's system includes the claimed "non-transient computer memory storing computer logic." *See, e.g.*, Pet. 8 (noting

[6] Patent Owner asserts this same single-image-retrieval-step deficiency in Kennedy is fatal to Petitioner's obviousness challenge to dependent claims 3 and 16, which require "using . . . latitude and longitude coordinates to access imagery from the second imagery database." PO Resp. 19–20. We disagree because, as explained above, Petitioner's asserted combination and rationale adequately account for a second image retrieval step.

that "Kennedy discloses an Internet-based mapping system"); *see also, e.g.*, Ex. 1004, Code (57) ("An exemplary system comprises a computer including . . . a working memory."), *id*. at 4:48–53 ("[C]ommercially available processors, memory modules, input/output ports and other commercially available hardware components are suitable for use in constructing embodiments of [the] system."). In addition, the at-issue memory language appears in claim 14's preamble. As a general rule, a claim's preamble is not limiting unless it "is necessary to give life, meaning and vitality to the claim." *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1346 (Fed. Cir. 2002) (internal quotation marks omitted). Although, as Patent Owner notes, a different preamble term ("a roof structure") provides an antecedent basis for later-used term, *see* PO Resp. 21, that "does not necessarily convert the entire preamble into a limitation." *TomTom, Inc. v. Adolph*, 790 F.3d 1315, 1323 (Fed. Cir. 2015). Here, claim 14 does not recite any step related to the preamble's memory. Because claim 14 describes a structurally complete invention without the preamble's non-transient computer memory, we find that phrase is not limiting.

*4. Rationale for Combining Kennedy and Florance*

Petitioner explains that a skilled artisan would have been motivated to include Florance's movable markers in Kennedy's search so that users could easily update location information "to more accurately represent the locations of the buildings" and thereby ensure that searches "encompass[] only the appropriate propert[y] within the defined geographic area." Pet. 18–19 (quoting Ex. 1005 ¶ 627); *see id.* at 36. Patent Owner argues that Petitioner's rationale for combining Kennedy and Florance is insufficient for several reasons. First, Patent Owner faults Petitioner for relying on passages in

Florance related to accuracy because, Patent Owner contends, Florance deals with accuracy in pre-defined geographic-search areas, not in images. *See* PO. Resp. 24–27. Patent Owner also criticizes Petitioner's statement that "Kennedy describes [location information] as 'often' inaccurate," because "nowhere in Kennedy's specification does the term 'often' appear let alone any description that there is a need to 'update location information for a building' because it is 'often' inaccurate." *Id.* at 27–28.

We disagree with Patent Owner because even if Florance addresses accuracy in pre-defined geographic-search areas rather than images, that does not undermine Petitioner's general contention that using Florance's method (i.e., moving a marker from a preliminary position to a property's center) would ultimately improve accuracy and exclude unwanted properties in Kennedy's oblique images. Likewise, even if Kennedy never asserts that location information is often inaccurate, that does not undermine Petitioner's rationale because Petitioner's reason to combine references need not be explicit in the prior art. *See KSR*, 550 U.S. at 419. Given Petitioner's accuracy-improvement rationale, Petitioner has articulated sufficient reasoning with rational underpinning to support its assertion that including Florance's movable markers in Kennedy's system would have been obvious to one skilled in the art. *See id.* at 418, 419.

*5. <u>Kennedy's Figures 1 and 36</u>*

Patent Owner argues Petitioner's obviousness challenge fails because Petitioner relies on Kennedy's Figures 1 and 36, which are not prior art to the challenged claims. PO Resp. 31–36. Patent Owner explains that the versions of Figures 1 and 36 that appear in the Petition are replacement drawings that were filed after the '880 patent's priority date. *Id.* at 31. According to Patent

Owner, the Petition is fatally flawed because it uses the replacement drawings "as part of [its] basis for challenging" multiple claim elements. *Id*. at 33–34.

As-filed and as-issued Figure 1 is reproduced below, with annotations added.




PO Resp. 33. As-filed Figure 1 is shown above, left, while as-issued Figure 1 is shown above right. As-filed and as-issued Figure 36 is reproduced below, with annotations added.




FIG. 36




PO Resp. 32. As-filed Figure 36 is shown above, left, while as-issued Figure 36 is shown above right.

We disagree with Patent Owner's argument that the Petition is "fatally flawed" because it relies on issued Figures 1 and 36 rather than the as-filed versions. Patent Owner does not identify any specific instances in which the Petition actually relies on the added material missing from the as-filed versions. *See* PO. Resp. 33–34. Instead, Patent Owner makes a general assertion that "Petitioner relies on issued Figs. 1 and 36, including the newly added portions, throughout their analysis," followed by a cite to every instance in which the Petition cites to either Figure 1 or Figure 36. *Id.* However, as Petitioner explains, the figures' relatively minor changes do not impact Petitioner's assertions regarding how Kennedy teaches each claim limitation. Pet. Reply 18–20; *see* Pet. 26–59. Patent Owner does not contest Petitioner's assertion in this regard. *See generally* PO Sur-reply. In these circumstances, we decline to fault Petitioner for reproducing the issued versions of Figures 1 and 36 rather than the as-filed versions.

*6. Remaining Uncontested Limitations*

As for the remaining limitations of claims 1–20, Petitioner provides a detailed analysis demonstrating that Kennedy's, Florance's, and Kreft's combined disclosures teach every element of the challenged claims. *See* Pet. 25–59. For example, Petitioner presents evidence that Kennedy's address-input interface and aerial photograph retrieval teaches the independent claims' "computer input field" that provides "visual access to an aerial image." Pet. 26–29. Petitioner presents evidence that Florance's overlaid icon teaches the claimed movable "visual marker." *Id.* at 29–31. Petitioner presents evidence that Kreft's Figure 19 shows user dialog box 1905, which Petitioner corresponds to the claimed "computer input capable of signaling user-acceptance." *Id.* at 32–33. Petitioner also presents evidence that Kennedy's perspective views teach the claimed "oblique images." *Id.* at 34–37. Petitioner further presents evidence that its asserted Kennedy/Florance/Kreft combination teaches the additional limitations recited in the challenged dependent claims. *Id.* at 38–59.

Other than the arguments addressed above, Patent Owner does not additionally challenge Petitioner's obviousness showing based on Kennedy, Florance, and Kreft. We have reviewed Petitioner's arguments and evidence and, based on that analysis, we find Petitioner has shown by a preponderance of the evidence that claims 1–20 would have been obvious over Kennedy, Florance, and Kreft.

B. PROCEDURAL REQUIREMENTS UNDER 37 C.F.R. § 42.104(B)(3)–(4)

Patent Owner argues that Petitioner fails to meet its burden under 37 C.F.R. § 42.104(b)(3), which requires the Petition to identify "[h]ow the challenged claim is to be construed." PO Resp. 70–71. Specifically, Patent

Owner criticizes Petitioner for failing to identify express claim constructions from a prior *inter partes* review involving the '880 patent and for failing to identify claim-term definitions expressly provided in the '880 patent. *Id.*

We disagree with Patent Owner's argument. Under our Rule 42.104(b)(3)–(4), a Petition must identify "[h]ow the challenged claim is to be construed" and "[h]ow the construed claim is unpatentable," by "specif[ing] where each element of the claim is found in the prior art." 37 C.F.R. § 42.104(b)(3)–(b)(4). Here, the Petition identifies that "no formal claim constructions are necessary." Pet. 7. With this understanding, Petitioner identifies where the prior art teaches each claim element, and does so without the need for additional, express constructions. *Id.* at 25–59, 67–84. In the context of this *inter partes* review, we determine that this is sufficient. Our interpretation of Rule 42.104(b) is consistent with its regulatory history, which indicates that the goal for setting forth claim construction is to provide sufficient notice to Patent Owner, which Petitioner has adequately done here. *See* 77 Fed. Reg. 48,688; *id.* at 48,699–700.

### C. ALTERNATIVE OBVIOUSNESS GROUNDS

In its second and third obviousness grounds, Petitioner asserts that claims 1–3, 8–16, and 20 would have been obvious over Keane, Florance, Kreft, and that claims 4–7 and 17–19 would have been obvious over Keane, Florance, Kreft, and Kennedy. Pet. 59–84. Because Petitioner has shown these same claims would have been obvious in its first ground, we do not address these two alternative grounds.

## IV. CONCLUSION

For the foregoing reasons, we determine Petitioner has demonstrated by a preponderance of the evidence that claims 1–20 of the '880 patent are unpatentable.[7] Our conclusions are summarized in the following table.

| Claim(s) | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not shown Unpatentable |
|---|---|---|---|---|
| 1–20 | 103 | Kennedy, Florance, Kreft | 1–20 | |
| 1–3, 8–16, 20 | 103 | Keane, Florance, Kreft[8] | | |
| 4–7, 17–19 | 103 | Keane, Florance, Kreft, Kennedy[9] | | |
| **Overall Outcome** | | | 1–20 | |

## V. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 1–20 of the '880 patent are unpatentable; and

[7] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding*. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

[8] We do not reach this ground because it would not change the outcome of this case.

[9] We do not reach this ground because it would not change the outcome of this case.

FURTHER ORDERED that, because this is a Final Written Decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

PETITIONER:

W. Karl Renner
Thomas Rozylowicz
Daniel D. Smith
W. Ryan Klima
Patrick Darno
Patrick Bisenius
Craig Deutsch
Yao Wang
FISH & RICHARDSON P.C.
axf-ptab@fr.com
tar@fr.com
dsmith@fr.com
klima@fr.com
darno@fr.com
bisenius@fr.com
deutsch@fr.com
ywang@fr.com

PATENT OWNER:

Kyle Howard
Gregory Webb
Jonathan Bowser
HAYNES AND BOONE, LLP
kyle.howard.ipr@haynesboone.com
greg.webb.ipr@haynesboone.com
jon.bowser.ipr@haynesboone.com

US008542880B2

(12) **United States Patent**
**Thornberry et al.**

(10) **Patent No.: US 8,542,880 B2**
(45) **Date of Patent: *Sep. 24, 2013**

(54) **SYSTEM AND PROCESS FOR ROOF MEASUREMENT USING AERIAL IMAGERY**

(71) Applicant: **Pictometry International Corp.**, Rochester, NY (US)

(72) Inventors: **Dale R. Thornberry**, Carmel, IN (US); **Chris T. Thornberry**, Indianapolis, IN (US); **Mark F. Garringer**, Eaton, IN (US)

(73) Assignee: **Pictometry International Corp.**, Rochester, NY (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/774,478**

(22) Filed: **Feb. 22, 2013**

(65) **Prior Publication Data**

US 2013/0170694 A1 Jul. 4, 2013

**Related U.S. Application Data**

(63) Continuation of application No. 12/470,984, filed on May 22, 2009, now Pat. No. 8,401,222.

(51) **Int. Cl.**
***G06K 9/00*** (2006.01)

(52) **U.S. Cl.**
USPC .......................................................... **382/103**

(58) **Field of Classification Search**
USPC ......... 345/423–426; 703/1–9; 382/100–107; 715/835–838; 340/990–995.27
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

2009/0141020 A1 * 6/2009 Freund et al. ................ 345/419

* cited by examiner

*Primary Examiner* — Atiba O Fitzpatrick
(74) *Attorney, Agent, or Firm* — Dunlap Codding, P.C.

(57) **ABSTRACT**

Processes and systems are disclosed for determining attributes of a roof structure of real-world three-dimensional building(s), including providing computer input field(s) for a user to input location data generally corresponding to the location of the building, providing visual access to a nadir image of a region including the roof structure of the building; on the nadir image of the region, providing a visual marker that is moveable on the computer monitor around the region, the visual marker initially corresponding to the location data but which may be moved to a final location, having location coordinates, on top of the building to more precisely identify the location of the building roof structure; providing a computer input capable of signaling user-acceptance of the final location of the marker; and, providing visual access to one or more oblique images of an aerial imagery database corresponding to location coordinates of the final location.

**20 Claims, 21 Drawing Sheets**





NEARMAP-1001


AERIAL IMAGERY
1
CREATE FIRST LAYER DRAWING
2
CREATE SECOND LAYER DRAWING
3
SUBSTANTIALLY OVERLAPPING SEGMENTS
4

*Fig. 1*


AERIAL IMAGERY
1
PERIMETER DRAWING AROUND PLANES
5
DELIVER INTERACTIVE COMPUTER FILE
6
USER ENTER VALUE
7
UPDATED REPORT
8

*Fig. 2*


LOCATION DATA
4A
AERIAL IMAGERY WITH MARKER
4B
MOVE MARKER ON BUILDING
4C
USER ACCEPTANCE SIGNAL
104a

*Fig. 3*


100
ADDRESS:
1710 STRAND AVE., TYBEE ISLAND, GA. 31328
FIND ADDRESS
CONFIRM SELECTION
CANCEL
101
102
103
104
105

*Fig. 4A*


100
ADDRESS:
1710 STRAND AVE., TYBEE ISLAND, GA. 31328
FIND ADDRESS
CONFIRM SELECTION
CANCEL
101
102
103
104
105
106a
500
501
502

*Fig. 4B*


100
105
CANCEL
CONFIRM SELECTION
104
FIND ADDRESS
103
ADDRESS:
1710 STRAND AVE., TYBEE ISLAND, GA. 31328
101
102
106b
501
500
502

*Fig. 4C*


100
502a
106b
I have reviewed the image and confirm my selection is correct.
LATITUDE REFERENCE:
38.7492
LONGITUDE REFERENCE:
-85.2748
ADDRESS TO BE MEASURED:
1710 STRAND AVE.
108
CITY:
TYBEE ISLAND
109
STATE:
GA.
110
ZIP CODE
31328
111
NUMBER OF PLANES
112
RUSH PROCESSING
113
OPTIONAL:
REFERENCE NUMBER:
114
CLAIM NUMBER:
115
116
ADD TO CART

*Fig. 4D*


550
North
502
South
503
GeoEstimator
www.geoestimator.com
Thornberry Consulting, LLC
10825 Cyrus Drive
Indianapolis, Indiana 46231
1710 Strand Ave
Tybee Island GA, 31328
Claim #:
Reference:
Order #:
Sheet:
Views:
North/South

***Fig. 5A***


550
505
504
West
East
GeoEstimator
www.geoestimator.com
Thornberry Consulting, LLC
10825 Cyrus Drive
Indianapolis, Indiana 46231
1710 Strand Ave
Tybee Island GA, 31328
Claim #:
Reference:
Order #:
Sheet:
Views:
East/West

**Fig. 5B**


509
510
511
512
513
Name
Total
507
508
550
N
506
501
1710 Strand Ave
Tybee Island GA, 31328
Thornberry Consulting, LLC
10825 Cyrus Drive
Indianapolis, Indiana 46231
GeoEstimator
www.geoestimator.com
Claim #:
Reference:
Order #:
Sheet:
Overview

*Fig. 5C*


512
510
511
513
Type
Length
550
N
Claim #:
Reference:
Order #:
Sheet:
Edges
1710 Strand Ave
Tybee Island GA, 31328
Thornberry Consulting, LLC
10825 Cyrus Drive
Indianapolis, Indiana 46231
GeoEstimator
www.geoestimator.com
512a
510a
515a
515
516a
516
501
514
511a
513a

*Fig. 5D*


516b
515b
Plane
Pitch
Area
515c
550
516a
516c
515a
515
516d
516
501
Sheet:
Pitch
Claim #:
Reference:
Order #:
1710 Strand Ave
Tybee Island GA, 31328
Thornberry Consulting, LLC
10825 Cyrus Drive
Indianapolis, Indiana 46231
GeoEstimator
www.geoestimator.com

*Fig. 5E*


516b
516c
Plane
Area
Pitch
550
N
516b
Thornberry Consulting, LLC
10625 Cyrus Drive
Indianapolis, Indiana 46231
1710 Strand Ave
Tybee Island GA, 31328
Claim #:
Reference:
Order #:
Sheet:
Area
GeoEstimator
www.geoestimator.com

*Fig. 5F*


550
501
516a
516b
Area
Description
Thornberry Consulting, LLC
10825 Cyrus Drive
Indianapolis, Indiana 46231
1710 Strand Ave
Tybee Island GA, 31328
Claim #:
Reference:
Order #:
Sheet:
Adjustments
GeoEstimator
www.geoestimator.com

*Fig. 5G*


Roofing
Plane
Area
Ridge
Plane
Length
Valley
Plane
Length
517
518
519
550
GeoEstimator
www.geoestimator.com
Thornberry Consulting, LLC
10823 Cyrus Drive
Indianapolis, Indiana 46231
1710 Strand Ave
Tybee Island GA, 31328
Claim #:
Reference:
Order #:
Sheet:
Tables

***Fig. 5H***


Perimeter
Plane
Length
Step Flashing
Plane
Length
520
521
550
GeoEstimator
www.geoestimator.com
Thornberry Consulting, LLC
10825 Cyrus Drive
Indianapolis, Indiana 46231
1710 Strand Ave
Tybee Island GA, 31328
Claim #:
Reference:
Order #:
Sheet:
Tables

**Fig. 5I**


509
510
511
512
513
Name
Total
507
508
510a
512a
501
506
511a
521
513a
1710 Strand Ave
Tybee Island GA, 31328
Claim #:
Reference:
Order #:
Sheet:
Overview
GeoEstimator


*Fig. 6*




Fig. 7A




| LINE | ATTRIBUTE |
|---|---|
| A | GUTTER FE |
| B | RIDGE |
| C | RIDGE |
| | |
| E | COMMON |
| F | NO GUTTER |
| G | NO GUTTER FE |
| H | NO GUTTER FE |
| E' | COMMON |
| X | NO GUTTER FE |
| Y | FLASHING |
| Z | NO GUTTER FE |

| PLANE | AREA |
|---|---|
| 715 | 200 SQ. FT. |
| 716 | 550 SQ. FT. |
| 717 | 40 SQ. FT. |
| | |
| | |

*Fig. 7B*




*Fig. 7C*




*Fig. 7D*

# SYSTEM AND PROCESS FOR ROOF MEASUREMENT USING AERIAL IMAGERY

## INCORPORATION BY REFERENCE

The present patent application is a continuation of the patent application identified by U.S. Ser. No. 12/470,984, filed May 22, 2009, of which the entire content of which is hereby incorporated herein by reference.

## FIELD OF INVENTION

The present invention is in the field of measuring roofing dimensions and other attributes, and more particularly pertains to the use of aerial imagery in that field.

## BACKGROUND

Roof measuring, for example, dimension, length and areas has been done for many years, such as in connection with for estimating and bidding roofing jobs. Also, for many years, companies and products have offered such estimation services and reporting software reports using aerial imagery on which roof line outlines are traced, dimensions and areas are automatically based on those tracings, and vertical elevations (via pitch or otherwise) are included in mathematical models.

The present invention is an improvement on such aerial imagery, systems and processes, providing non-obvious features that enhance convenience, flexibility, and/or accuracy.

## SUMMARY

The claims, and only the claims, define the invention. The present invention includes several, but not necessarily all, of creating a first layer and a second layer, in computer memory and substantially overlapping at least a segment of line from said first layer with at least a segment of another line from said second layer, wherein said first non-dimensional attribute is different from said second non-dimensional attribute; and/or an interactive computer file, said interactive computer file including: length numeric values and at least one user length field enabling a client with said interactive file to override at least one of said length numeric values, where said area operator may automatically recalculate area based on said length field override; and/or, providing at least one computer input field for a user to input first location data generally corresponding to the location of the building; on said imagery of an area providing a visual marker that is moveable on said computer monitor around a region, said marker initially corresponding to said first location data, wherein said marker may be moved to a final location on top of the building to more precisely identify the location of the building roof structure; and providing a computer input capable of signaling user-acceptance of the final location of said marker; and/or other features, optionally combined in various ways as set forth in the claims.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is one example of a flow chart of acts according to the present invention.

FIG. **2** is another example of a flow chart of acts according to the present invention.

FIG. **3** is another example of a flow chart of acts according to the present invention.

FIG. **4**A is one example of a computer screen shot to enter an address.



FIG. **4**B is one example of a computer screen shot depicting imagery and a marker based on an address.

FIG. **4**C is a computer screen shot like FIG. **4**B with the marker moved over a selected building.

FIG. **4**D is a computer screen shot and/or reporting confirming selection of a building.

FIG. **5**A is an example of reporting.

FIG. **5**B is another example of a screen shot and/or reporting.

FIG. **5**C is another example of a screen shot and/or reporting.

FIG. **5**D is another example of a screen shot and/or reporting.

FIG. **5**E is another example of a screen shot and/or reporting.

FIG. **5**F is another example of a screen shot and/or reporting.

FIG. **5**G is another example of a screen shot and/or reporting.

FIG. **5**H is another example a screen shot and/or of reporting.

FIG. **5**I is another example of a screen shot and/or reporting.

FIG. **6** is another example of a screen shot and/or reporting.

FIG. **7**A is a top plan view of aerial imagery of a building roof structure.

FIG. **7**B is a display of the imagery of FIG. **7**A with some optional features.

FIG. **7**C depicts the imagery of FIG. **7**A with shadowing.

FIG. **7**D depicts FIG. **7**C with the addition of computer generated line.

## BRIEF DESCRIPTION OF THE PREFERRED EMBODIMENTS

For the purposes of promoting an understanding of the principles of the invention, reference will now be made to the examples, sometimes referred to as embodiments, illustrated and/or described herein. Those are mere examples. It will nevertheless be understood that no limitation of the scope of the invention is thereby intended. Such alterations and further modifications in the described processes, systems or devices, any further applications of the principles of the invention as described herein, are contemplated as would normally occur to one skilled in the art to which the invention relates, now and/or in the future in light of this document.

As used in the claims and the specification, the following terms have the following definitions:

The term "adjustment roof plane" means a roof plane, having at least three border lines, that may be hidden (partially or totally) from view from some or all aerial imagery and which may be included to add to (or subtract from) an aggregate roof area or other attributes.

The term "aerial imagery" means pictures, normally including photographs (visual light, infrared, color, black and white, or otherwise) taken from an overhead view (straight down, oblique, or otherwise) with respect to a building roof. This may include imagery taken from airplanes, satellites, balloons, or otherwise.

The term "attributes" means one or more distinguishing or identifying characteristic.

The term "border line" means a line segment, straight, curved, free form or otherwise that generally corresponds with the edge of a roof plane.

The term "building" means a real estate structure, such as for example, a house, condominium, office building, outbuilding, garage, warehouse, factory or otherwise.

The term "client" means a person or entity that orders or obtains an aerial imagery report.

The term "computer input" means data, information and/or signals provided by a computer user. This may include numbers, words, mouse clicks, "enter", check boxes, dialog boxes, and otherwise.

The term "computer monitor" includes any computer screen or other visual output, including projectors, flat panel screens, LCD screens, LED screens and otherwise that provide visual output from a computer.

The term "computer processing means" means computer hardware and software, including computer memory, microprocessors, computer code and computer logic to provide digital computing.

The term "contrast" means discernable relative differences in lightness and darkness.

The term "deliverable" means that which is or may be delivered to a client, including printed and/or electronic reports and information.

The term "digital" means using numeric digits, specifically including binary digits.

The term "direct proportion" means that one or more variables that change as a function as another value in a generally linear function.

The term "dissects" means to sub-divide into two or more parts.

The term "electronic drawing" means to draw lines and/or shapes electronically via computer. This can include pixel-based drawings, vector-based drawings, and/or otherwise.

The term "field" means a location for computer data input and/or output of a value having at least one corresponding associated place in computer memory.

The term "final location" is the relative spot for placing a marker. This normally corresponds to unique latitude and longitude coordinates.

The term "generating" means to make or create.

The term "imagery database" means a computer database containing aerial imagery computer files and the associated location coordinates.

The term "interactive computer file" is a computer file in which a user may input and/or override one or more numeric values stored in memory as part of the file.

The term "internet-based imagery" means imagery, such as aerial imagery, which is accessible through an internet access connection. One popular example is Google® Earth.

The term "latitude and longitude coordinates" mean numeric coordinates for a location on the planet corresponding to latitude (east, west) and longitude (north, south).

The term "layer" means a part of a graphic computer file that visually overlays one or more other parts and which has at least partially transparent portions allowing visualizations of parts/layers below it.

The term "lines" means a straight, curved, and/or free form segment.

The term "location data" means information which uniquely identifies geographic position. This may include latitude and longitude coordinates, street addresses and/or otherwise.

The term "non-dimensional attribute" means an attribute other than a numeric value, such as other than length, width, height, or area.

The term "numeric values" means alphanumeric numbers, and/or their binary equivalent.

The term "operator" means a mathematical function including, but not limited to multiplication, division, addition, subtraction, sum, average, square root and/or the foregoing with or without constant and/or co-efficient.



The term "orientation" means the direction of something with respect to something else.

The term "outline" means the path or collection of lines generally coinciding with the outside of a shape.

The term "outline drawing" means drawing of lines around an outline.

The term "over said imagery" means position on top of and in alignment with underlying Imagery.

The term "override" means to substitute or replace one value for another value. This may be done with numeric values, non-dimensional attributes and otherwise.

The term "perimeter lines" means a line or lines that outline the outer most edge of a roof structure. This can include, but is not limited to, a roof free edge with a gutter and to a roof free edge without a gutter.

The term "pitch numeric value" is a single numeric value corresponding to the pitch or slope of a portion of roofing.

The term "proportioning" means to increase or decrease the size of a line, outline or other object to directly proportional to the change in another object.

The term "region" means a location on earth that is depicted in aerial imagery. Ordinarily, it will include at least one entire building structure, and preferably, will include at least some features, such as streets, trees, or other buildings adjacent the building structure.

The term "report" means one or more pages or screen shots, or both, made available to a user including aerial imagery and/or data from such imagery. This includes, but is not limited to, one or more interactive computer files.

The term "roof flashing edge" means an edge where roofing meets with a generally vertical structure, such as a wall, typically with flashing.

The term "roof free edge with a gutter" means the unbound edge of a roof with a rain drainage gutter.

The term "roof free edge without a gutter" means the unbound edge of a roof without a rain drainage gutter.

The term "roof hip" means an edge where two roof planes meet to form a generally upward sloping ridge.

The term "roof pitch" means the slope of a roof plane. It may be expressed in angles, ratios, or otherwise. This includes stating the rise over run, as well as stating merely the rise in view of an assumed or industry standard run. For example, a slope of 6 inch rise for every 12 inch run (horizontal") may be stated to be a "6" pitch.

The term "roof plane" means a generally planer, segment of a roof.

The term "roof ridge" means an edge where two generally upward sloping roof planes meet.

The term "roof structure" means the top of a building which shelters the building from weather.

The term "roof valley" means an edge where two generally downward sloping roof planes meet.

The term "street address data" means the location typically used by postal identification, typically including at least one numeric value and at least one street name, and further typically including a zip code or other postal code and/or a town and state or province.

The term "street address look up field" means a computer field for entry of street address data.

The term "substantially overlapping" means that where one line, in whole or in substantial part, coincides with another line in terms of direction and overlap. This may include situations where the respective lines are of substantially different length, or not.

The term "substituent triangles" means two or more congruent triangles which collectively form a subset of another geometric shape.

The term "tracing" means drawing around an outline or along a line or feature depicted in Imagery.

The term "user-acceptance" means an affirmative step or series of steps or computer input, undertaken by user to make a selection.

The term "vector direction" means, in relative space, either two dimensionally or three dimensionally where a vector is pointing.

The term "visual marker" is a shape, pointer, label, icon, avatar or other indicator which is movable or displayable on a computer screen and which may be visually differentiated from other objects on the computer screen.

The term "visually depicting" means to show or illustrate something on a computer monitor as a graphical image.

Articles and phases such as, "the", "a", "an", "at least one", and "a first", are not limited to mean only one, but rather are inclusive and open ended to also include, optionally, two or more of such elements.

The language used in the claims is to only have its plain and ordinary meaning, except as explicitly defined above. Such plain and ordinary meaning is inclusive of all consistent dictionary definitions from the most recently published Webster's dictionaries and Random House dictionaries.

Referring to the drawing figures, these are only examples of the invention, and the invention is not limited to what is shown in the drawings.

## DETAILED DESCRIPTION OF THE DRAWINGS

Referring to FIG. **1**, a process for determining attributes of a roof structure **501** (see FIGS. **4**B, **4**C) of a real-world three-dimensional building **500** may optionally comprise several acts. This may include viewing on a computer monitor **100** in digital aerial imagery **1** of a region **502** (see FIGS. **4**B, **4**C) including the roof structure **501**. Ordinarily, the roof structure will have one or more roof planes, and unless the roof is a simple single-plane roof, will have at least two or more roof planes. In FIG. **1**, the act of creating of a first layer drawing **2** is undertaken. Such act may be used by the ultimate end-user enabled by the software, but optionally and more preferably is done by a commercial vendor based on an order placed by a user. Such order may be placed by telephone, on-line, such as on computer screen **100** as shown in FIGS. **4**A-**4**D, by mail, email or otherwise.

The creation of the first line drawing **2** may be done a multitude of ways, in one example is illustrated in FIGS. **5**A-**5**I and FIG. **6**, discussed further below. Likewise, in FIG. **1** creating a second layer drawing **3** is another act. For example, in FIG. **5**D, various roof planes are denoted by letters A-P. For example, the roof plane **515** denoted by the letter "0" may be drawn in a second layer, whereas roof plane **516** indicated by the letter "D" may be in a first layer. In such example, roof plane **515** and roof plane **516** have substantially overlapping segments **4** (see FIG. **1**). For example, along the upper edge of plane **515** appears the number "5" denoting a five foot **20** line; whereas, plane **516** has the substantially overlapping line denoted by "7" indicating a seven foot line segment of roof plane **516**. Such seven foot roof segment of plane **516** may comprise a perimeter line (part of the 56.78 feet perimeter length of plane D depicted in table **520** of report **550** of FIG. **5**I); whereas, the substantially overlapping five foot length of plane **515** may comprise a second non-dimensional attribute, namely flashing, such as step flashing line (part of the 37.01 feet of step flashing for plane **0** depicted in table **521** of FIG. **5**I). Accordingly, this is one example of substantially overlapping lines such as segment of line A and segment of line E set forth in the claims, each having respective first and second non-dimensional attributes. This allows for separate reporting of such non-dimensional attributes, such as the length of perimeter, the length of step flashing or otherwise. Such non-dimensional attributes may be of any type. As mere examples that have use in the roofing industry include the non-dimensional attributes of roof ridge, roof hip, roof valley, roof flashing edge, perimeter line, roof free edge with a gutter, and roof free edge without a gutter. For example, line **510***a* in FIG. **6** is an example of a roof ridge, whereas line **511***a* and line **513***a* are each examples of a roof valley. Line **512***a* in FIG. **6** is an example of a perimeter edge, which also happens to comprise a roof free edge without a gutter. Optionally, while not illustrated, if line **512***a* had, or were to have, a gutter along it, then it would be in that case a perimeter line and be a roof free edge with a gutter. FIG. **6**. also depicts an optional table and/or fields showing the non-dimensional attributes at **507** and the total 15 values for them at **508**. This can include the area of roofing **509**, the linear ridge feet **510**, linear valley feet **511**, starter/perimeter linear feet **512**, step flashing **513**, and/or others.

Another optional feature is computer processing means for calculating a vector direction corresponding to roof pitch for a roof plane. Optionally, this may be based on at least one of said non-dimensional attributes of roof plane outline lines and their orientation. Such computer processing means typically includes computer logic and/or code with a set of rules to establish such vector. Examples of such vector are shown in FIG. **5**E. Specifically, they are preferably shown as arrows. In the illustrated example, they are ordinarily indicated as arrows pointing in the downward direction, corresponding to the downward direction of rain flow. Optionally, there may be other illustrations, including an upwardly directed arrow, although this is not preferred. For example, vector **516***d* is shown in a downwardly directed arrow with a number 6 next to it. This depicts the vector corresponding roof plane **516**, namely plane D previously discussed. As seen, the value "6" for the pitch is entered at field **516***c* in the table also showing the area (for that particular roof plane D at field **516***a*) 357.93 sq. ft. as shown at field **516***b*. Note further with respect to roof plane **515** (plane "0") as illustrated in the table at field **515***a*, it likewise has a roof pitch of "6" shown at **515***c*. The total area of roof plane "0" is 111.35 sq. ft. in this particular example, as shown at **515***b*.

An example of computer programming to determine pitch direction is as follows.

1.) Pitch will run towards a perimeter line. If only one perimeter line pitch goes towards the perimeter (most standard roofs, all but the ends of hips);

2.) If there are multiple perimeters that are not parallel, look for ridge. If there is only a single ridge line and it is parallel to one of the perimeter lines, pitch runs from the ridge towards the perimeter. (Perimeters that are not straight and have small outcroppings where the roof extends further down the same slope).

3.) If a shape has no multiple perimeters and multiple ridges where none are parallel, take an average of the ridge angles and see if that direction is perpendicular to a perimeter line. If so, that direction is the direction of the pitch. (The end of hip roofs).

Most planes are resolved by the above acts, 2 and/or 3. Acts 4 and 5, below, are also optional but preferred, and address totally enclosed roof planes which most standard roofs do not have.

4.) If there are no perimeter lines and a single ridge line, the pitch is from the ridge.

5.) If there are no perimeter lines and multiple ridge lines, once finding the pitch for all other shapes look at the ridges

and the shared shapes. If the shared shape has a pitch directly away (is perpendicular) from the shared ridge, use that ridge as if it were 2 (from above). If the other pitch goes at an angle to the ridge, look at other ridges.

The case where you can make it past act 5 and not have pitch direction is for completely enclosed shapes where all sides are valleys at the intersection of multiple planes, set forth in this optional act:

6.) take the average slope of all other planes connected via shared lines and average the slope direction of the planes, whose pitch runs into the plane in question; use that direction as the pitch direction for the plane.

Variations on that logic, including changing the order, and/or combining or splitting acts, may optionally be used. For example, rather than beginning with logic looking to run pitch towards a perimeter, the logic could begin to look to first run the pitch vector away from a ridge line, although this is less preferred.

As illustrated in report **550** as seen in FIG. **5**E, the visual depiction of pitch vectors, such as **516***d* may help visualize the shape, orientation, pitches of the roof structure and/or roof planes.

Optionally, one or more deliverables to the client include one or more reports such as report **550**. Report **550** may include one or more of the features as depicted in the various drawings of FIGS. **5**A-**5**I and/or FIG. **6** and/or FIGS. **7**A-**7**D, alone or combination.

Optionally, such report may be printed on a piece of paper, or provided on a non-interactive computer file such as a .pdf (Adobe® Acrobat®) type image or otherwise, illustrated on a computer screen for the user to print out (web based or otherwise) and/or delivered on recordable media such USB drive, floppy disk, CD, DVD, email attachment or otherwise. However, preferably, such file is delivered as an interactive computer file. For example, referring again to FIG. **5**E, the pitch value as shown in the table, such as the 6 pitch for plane D and **516***c* allows the person, the end-user or otherwise, to enter at least one pitch numeric value. This pitch numeric value may correspond to roof pitch of the roof plane. Hence, in FIG. **5**E, one or more of the pitch values in computer fields corresponding to the table, may be empty or null. They may allow a person, such as an end user, to data input via their computer, the pitch value. For example, this may be based on the end user, or one of their agents, taking field measurements of the roof to provide the input. As such, value **516***c* may be entered to be "6" corresponding to a 6 pitch (e.g., 6" vertical rise for every 12" of horizontal run). Such value "6" may be changed, updated, or overridden.

As can be appreciated in three-dimensional geometry, given the shape of plane D (**516**) the value of the pitch ordinarily will affect the overall area of such roofing (see e.g. FIG. **5**F, area value **516***b*).

Mathematical equations demonstrating-area relationship for a sloped, rectangular roof plane are known, an example of which is set forth below:

$$\text{Area}=W\times Z$$

$$Z=\text{square root of: }(X^2+Y^2)$$

Where:

W=width

X=horizontal run

Y=vertical rise

Z=hypotenuse of X-Y-Z right triangle.

Other, geometries may be calculated using known math, coefficients and/or tables. See for example: Miller, Mark; *Miller's Guide to Roofing* (2005) ISBN 0-07-145144-7. Thus, in combination with the perimeter measurements supplied with the report based on the creation of roof plane D from the imagery, the addition of the roof pitch value may lead to the calculation such as in the example 357.93 sq. ft. shown at **516***b*. Likewise, for plane **0**, the value of "6" may be entered in the table at **515***c* to arrive at the area calculation **515***b* as previously described. It should be appreciated, that optionally these pitch values may be provided by the end user or other persons based on field measurement. However, optionally, they also may be based on measurements and/or computer calculations precisely, by estimate or otherwise, such as by viewing oblique imagery such as region image **502** shown in FIG. **4**B. In such case, for example, a vendor may provide default values (and/or absolute values) for the pitch and the table shown at FIG. **5**E. In an interactive computer file with such fields being interactive, and with operators to calculate area taking into account pitch, preferably part of said file, even with such default values based on oblique imagery the end user would be free to override them, such as for example if they determine that field measurements indicate a different pitch.

Another optional feature may include other attributes deliverable to the client including an interactive computer file. For example, the length values of lines forming an outline of a drawing may be overridden. For example, referring again to **5**D, a reference line **514** is depicted. In this one example, it is depicted in the parenthetical quote ("R"), although this is not required. In such case, it is denoted "26" corresponding to 26 ft. in length. Note that all dimensions in this case may be converted to or express in metric, rather than English units, although for purpose of illustration English dimensions are utilized here.

In such case, even thought the referenced dimension 26 is based on scaling that line off of the imagery, such as imagery **506** (see FIG. **6**; FIG. **5**C) there is an opportunity for greater precision. Such interactive computer file, for example, in the report page shown at FIG. **5**D, the value 26 depicted there in connection with the reference may actually be the location of a data entry field. In such case, the field operator may determine that the precise measurements are not 26 feet, but rather are 26.15 feet. In such case, the user operator may enter in their computer by typing in the value "26.15" the reference line field, thereby overriding it from 26 to 26.15 in this hypothetical. In such case, the interactive computer file may use co-efficient and other ratios to proportion (by multiplication or otherwise) some, or preferably, each of the other lines of an outline in direct proportion to the plane field override. While the foregoing is mentioned in terms of the referenced mentioned **514**, optionally the interactive computer file may provide multiple reference directions and/or all line values in their report may, optionally, be interactive and override fields. As mere examples, in FIG. **5**D this could include fields for **510***a*, **511***a*, **512***a* and/or otherwise, including without limitation most or all numeric values.

Moreover, while not illustrated, optional report **550** may include a separate table and/or field entry point apart from the drawing of the building roof structure **501** in which the reference line may be overridden instead or, or in addition to, fields directly overlying the aerial imagery and/or the drawn lines.

Optionally, but preferably, in addition to the length of the other lines being proportionally recalculated, likewise the area values, such as depicted in the area column of the table at FIG. **5**E as well as the area values on FIG. **5**F and/or FIG. **6** (see the total roofing area value **509** of 4096.95 sq. ft. may be automatically recalculated. This may be done in a separate

application, in the interactive computer file (including with embedded operators), both or otherwise.

Various area calculations used in connection with computer data processing means are available based on known geometry. These could include things as simple as multiplying length times width of a single rectangle. They also may include modifying such area to take into account the additional area generated by pitch, as previously discussed. However, while not limited to this, preferably, taking advantage of the pixilated imagery that may be used, one optional feature in determining one or more areas of the respective roof planes is as follows. If you know the points (corners) of the shape and can order them in a clockwise (or optionally, counter-clockwise) fashion following the perimeter or outline of the shape, then the following algorithm can apply. Starting at the first endpoint, 0 (zero), while N+1 is less than the total ordered end points take the triangle made by the 3 points 0, N, and N+I and compute the area of the triangle created, which is done by the dot product method using vectors created by going from 0 to N and 0 to N+I. Add this area to a running sum.

Note that when the three ordered endpoints are not in the proper order (they create a convex perimeter or outline of the shape that reduces the overall area as opposed to adding to), the dot product method of finding the area will return a (−) negative area which subtracts from the overall area in the running sum.

Dot product (2-Dimensional Vectors) can be expressed in the equation:

$$uv=u_1v_1+u_2v_2$$

This can be used to find the area of the square that the two vectors produce. Dividing the result by two (2) gives the area of the triangle the two vectors produce.

Thus, in this way an example is provided of computer data processing means that dissects the outlines of the roof planes into substituent triangles and calculates the area of such triangles. The areas are aggregated to provide the area of respective roof planes, and the areas of such respective roof planes may in turn be aggregated (summed) to arrive at the total area of the roof structure. Examples of this are shown in the table in FIG. **5**F and/or table **517** in FIG. **5**H. Note also in FIG. **5**H the report **550** may also include other tables and information, such as ridge length table **518** and/or valley length table **519**.

Hence, in FIG. **2**, aerial imagery **1** is used and perimeter drawings around roof planes are acts. Thereafter, one or more interactive computer files are delivered **6**. The user may enter values in the interactive computer file **7**, such as pitch, length, or otherwise as discussed. This may result in the act of updating the report **8**.

Another optional feature is to provide for user acceptance of the final location of a roof structure. One optional way to do this is to provide an internet based interface for the customer/user. One example of such is shown in FIGS. **4**A-**4**D. For example, in FIG. **4**A, computer screen **100** provides a place to enter an address, such as field **102** for address entry (denoted by label **101**). In the illustrated example, the street address "1710 Strand Ave, Tybee Island, Ga. 31328" may be entered in field **102** of the computer. The user may enter by clicking or otherwise button **103** to find that address. In response, computer screen **100** may appear like FIG. **4**B. As such, it may depict imagery **502** of a region, the region including building **500** with its roof structure **501**. Ordinarily, this includes not only the building structure **500**, but also depicts adjacent buildings, trees, streets, and/or other features. Such imagery may come from a variety of places. One example could be Google® Earth imagery database which is web based and provides address location information. Such imagery covers much of the world, although it may or may not be comparatively low resolution imagery. In FIG. **5**B, marker **106***a* is shown in the region **502**, corresponding to the street address in field **102**. Note further that while marker **106***a* is close to roof structure **501**, it does not directly or perfectly correspond to roof structure **501**. As such, the customer or other user may be allowed to move the marker (by click and dragging via computer mouse, arrows, or otherwise) to a final location **106***b* as depicted in FIG. **4**C. Such final location is on top of the building **500** and such movement more precisely identifies the location of the building roof structure **501** to be measured. Optionally, in FIG. **4**C when said marker has been moved to final location **106***b*, the user may activate a selection confirmation, such as confirm selection button **104**, enter, checkbox or otherwise. Optionally, to potentially start over the user may be afforded the option of hitting the cancel button **105** or merely logging off. However, if confirmed selection button **104** or other such user acceptance is activated, another screen (and/or report) optionally may be provided, such as screen **100** as depicted in FIG. **4**D. While this may be a wide variety in the formats, in the one example provided, some or all of the regional image **502***a* may be depicted showing the marker in its final location **106***b*. Also, a checkbox may be providing a further reconfirmation that the users reviewed the image is correct. In this way, the end user/customer will be sure that when placing an order, the vendor is measuring the correct roof structure as opposed to, for example, measuring the nearby roof structure due to mistake/miscommunication. Optionally, as shown in FIG. **4**D, fields may depict the address to be measured **108**, the city **109**, the state **110**, the postal code **111**, and otherwise. Optionally, a drop down box **112** may be provided corresponding to the number of planes ordered. Additionally, other options, such as rush processing **113** or other special features may be provided. Also optionally, a reference number or other such job number field **114** or claim number field **115** and/or other fields may be available. Thus, for example, a roofer having a job number and/or bidding pursuant to an insurance claim number and/or an insurance company doing the same may optionally enter data therein. When they do so, optionally, such reference numbers and/or claim numbers may be reprinted or otherwise depicted on the deliverables to the client, such as report **550**. This provides convenience to the end user/customer in that they may cross reference their deliverable report to their internal calendaring, docketing, invoicing, and/or job number system.

Also with reference to FIG. **4**D, computer screen **100** and/or the reports may also depict latitude references and/or longitude references corresponding to the street address and/or more precisely to the final location **106***b* of the marker confirmed by the end user. Again, optionally, such latitude and longitude coordinates may be reflected in one or more of the reports.

Such translation to latitude and longitude coordinates also provides another optional feature. The present system and method may optionally include two or more separate imagery databases. For example, a lower resolution and/or less expensive image database such Google® Earth may be used as a first database, whereas a higher quality, higher resolution and/or more robust image database, such as by Pictometry International (as depicted here) may be used. Other vendors of imagery databases may be used and/or one may use their own image database(s). Thus, by translating the street address stated in longitude and latitude, it is easier to correlate to the second database. In this way, first imagery database from which the final location is selected may be internet based imagery having to corresponding street address look up field.

Only further using the latitude and longitude coordinates to access imagery from a second imagery database, such as for example Pictometry's database. Thereafter, using the imagery from the second database can generate in computer memory outline drawings around outlines corresponding to roof planes based on tracing from imagery from said second imagery database. Such outline drawings may include drawings such as depicted in FIGS. **5**D, **5**E, **5**F, **5**G and/or FIGS. **6** and/or **7**B-D for example. Additionally, since the first imagery database may merely be straight down, or plan views, whereas the second imagery may include a variety of oblique images, such as image **502** and **503** in FIG. **5**A and/or oblique imagery **504** and **505** in FIG. **5**B, as well as diagonal, top down imagery such as image **506** in FIG. **5**C. This allows the optional, more complete image reporting to the client in report **505**.

Such oblique imagery also permits the optional feature, as previously discussed, determining vertical measurements and/or roof pitches based on the imagery, as opposed to based on field measurements. Conversely, one can undertake this without any oblique imagery and/or any determination of vertical measurements or pitch, and instead rely on field measurements or other means for pitch.

In FIG. **3**, the location data **4**A is entered. Aerial imagery with a marker is provided **4**B. A person moves the marker on the image of the building **4**C. User acceptance of that marker position is then signaled **104***b*.

Mere examples of other optional features are depicted in FIGS. **7**A and **7**B. A simplified diagrammatic image of building **700** includes roof structure **701**. While several roof planes are illustrated, the particular focus is directed to roof planes **715** and **716**. As illustrated in FIG. **7**B, a first electronic drawing (preferably in a first layer of the drawing) is made over the imagery comprising lines A, Band C. Moreover, a second electronic drawing (preferably, but not necessarily, in a second layer of the drawing) is made over to imagery comprising lines E, F, G and H. Note that in this illustrated example, at least a segment of line A is substantially overlapping with at least a segment of line E. Thus, for example, roof plane **715** outlined by E, F, G and H may comprise a flat roof (0 pitch) porch whereas the remainder of the roof structure **701** may comprise a hip roof over a rectangular house, the hip roof being depicted in a plan view with two triangles and two isosceles rhombuses, as shown.

Note further that FIG. **7**B preferably is depiction of a deliverable, such as a report (and/or a screen shot), and optionally and more preferably is part of an interactive computer file. In this regard, it may include, optionally, table **720** and/or **721**, as well as any of the other tables and/or fields and/or features previously depicted in the previous drawings. For example, table **721** includes at least columns with a line and a column for the attribute, which preferably in this context is the non-dimensional attribute. Note in the example of these substantially overlapping lines A and E, A has the attribute of being a gutter free edge, whereas E has the attribute label "common".

In this regard, the label "common" also corresponds to Line E' in connection with roof plane **717**' illustrated in isolation as roof plane **717**. Other terms may be used instead of "common", but this indication denotes two lines that are substantially overlapping and in which the main purpose of the line is merely for dissecting a common roof plane, normally for determining square feet area, as opposed to a non-dimensional attribute. This is because such "common" lines, in a sense, are imaginary between roof plane **715** and roof plane **717**' and/or **717**. Alternatively, in the context of this building the attribute of line E could be "flashing" (instead of



line Y being flashing) based on the reasonable assumption that this flat planed porch roof abuts the side of the building and has roof flashing along line Y. However, in such situation by denoting line E as flashing, in lieu of line Y, since they are of common length, this is merely a substitute for the total linear estimate of flashing of the type illustrated, for example at **513** (FIG. **20 6**) and/or table **521** (FIG. **5**I).

Plane **716** illustrates a minimum number of three lines, A, B and C, to denote the area of plane **716**. Conversely, note that plane **715** includes not only three lines, lines E, F and G, but also a fourth line, line H since it is rectilinear. This is consistent with the claiming of the present invention being open-ended in that at least three lines are required to define a roof plane, but it may be more. Likewise, a plane may be defined by 5, 6, 7 or more lines depending on its particular geometry.

As mentioned, it is not required, but is preferable that the lines defining the respective plane **715** and **716** are separate from each other, and even more preferable that they be in separate computer file layers overlaying one another. This helps facilitate having differing attributes along a common line as previously described in connection with the substantial overlap of lines A and E. Optionally, in the report the lines may be shown in different colors (and/or patterns) designated for each non-dimensional attribute.

Moreover, one or more additional adjustment planes, such as adjustment plane **717** prime, also depicted as free standing adjustment plane **717** may optionally be provided. This allows generating computer memory at least one adjustment roofing plane, such as by drawing lines E', X, Y and Z (as well as others). This is useful for a variety of situations, such as, for example, to adjust for portions of the roof structure which are not fully visible from the aerial imagery. This is shown in FIGS. **7**A and **7**B in that due to the overhanging eve of the hip roof of the house in plane **716**, part of the porch's roof structure is hidden by the overhanging roof hang. This hidden portion is depicted by roof plane **717**' and/or **717**.

It should also be noted that optionally, this adjustment plane does not necessarily have to be graphically depicted, as shown in FIG. **7**B. Rather, or in addition, an additional numeric field **20** may be provided. For example, in FIG. **5**F, the planes A-P are shown with their respective areas, and in some total of such areas. In this context, with or without a graphical depiction, an additional "plane" row may be provided denoted "adjustment" or otherwise with a numeric field allowing user entry of an area (square foot or otherwise) number be typed in or otherwise imported. Thus, the adjustment plane **717** (FIG. **7**B) even if not graphically depicted, might have known dimensions of, for example, 20 feet wide, with a two foot pitch overhand, resulting in an additional 40 feet of area. In this situation, in the adjustment field the user might simply enter the value "40" in square footage terms for the adjustment field. This adjustment field will be added to the sum total, such as shown in the table of FIG. **5**E. Note also that the adjustment value may be negative for a variety of reasons, given the user the ability to override and reduce the total estimation of square footage for reasons of discounting, or other circumstances.

Thus, for example, in FIG. **7**B at table **21**, it is denoted in that table as plane **717** with corresponding area of 40 square feet may correspond to a report that it is 20 feet wide (line E prime times 2 feet deep under the eaves, lines X and/or Z, thereby resulting in the calculation of 40 square feet. Or, as described above, alternatively with or without graphic depiction of plane **717**, the user might simply enter the value "40" square feet in the area field of table **721**.

FIGS. **7**C and **7**D, using the same structure of **7**A and **7**B, illustrates another feature which is optional, and may be used

alone, or in connection with one or more of the features previously described. In particular, it provides for a computer data processing means that identifies light and dark contrast between adjacent roof planes, such as roof planes **716** and **718**, and based on that automatically generates at least one border line, such as for example line **719** shown in FIG. **7**D between such roof plane **716** and **718**. In this regard, note that as illustrated in FIGS. **7**C and D, roof plane **716** is shown as shaded. This represented in imagery of shadowing, typically caused by sun or other lighting casting different degrees of shadow in brightness and darkness depending on the orientation of the roof plane with the source of the light. The generation of various lines, such as line **719**, is automatically computer generated. This may be done by a variety of techniques borrowed from the separate field of computer face recognition used in connection with digital images such as for security purposes. This may be done to create some or all of the line values, or more preferably at least starting point default lines drawing by the computer. However, optionally the default generation of the lines can be done after perimeter lines P, around the entire outer perimeter of the roof structure **701**, having drawn ordinarily by a human user. This has the advantage of establishing a closed, finite area within the region for which the computer software automatically generates one or more of the lines separating the geometries of the separate roof planes. Preferably, this is done by generating and labeling discreet lines which may be overridden by the user, such as deleting extraneous or erroneous or duplicative lines and/or moving them. Moreover, optionally such lines may be generated as the subparts of geometric shapes set as presumptive default shapes common in roof planes. This normally would include rectangles, triangles and rhombuses.

Additionally, such automatic and/or default generation of lines may optionally be coupled with the previously described pitch generation algorithms. In this way, default pitches may be generated by the computer and depicted in the report output. Again, this can be overridden by the user, including the vendor of such report information.

Note also that in FIG. **7**A-**7**D, the various lettered lines (A, B, C, E, F, G, H), are illustrated here slightly offset from the actual underlying line in the building imagery. In practice, preferably so as to maximize accuracy, there is not such offset. Rather, the offset is depicted here in FIG. **7**A-D merely for drawing clarity to separately depict the line in the aerial image from the computer drawn line overlaying the image.

Another optional feature is that the information, including reporting, may be made to interface electronically (and/or manually) with other products. For example, the information provided here may be uploaded or transferred to Xactimate™ Insurance estimating software known in the prior art. Naturally, this feature, while helpful, is not required.

What is claimed:

**1**. A process for determining attributes of a roof structure of a real-world three-dimensional building, comprising the acts of:

providing at least one computer input field for a user to input first location data generally corresponding to the location of the building;

providing visual access to an aerial image of a region including the roof structure of the building corresponding to said first location data, the aerial image taken from a straight down overhead view with respect to the roof structure;

on the aerial image of the region, providing a visual marker that is moveable on a computer monitor around said region, said visual marker initially corresponding to said first location data, wherein said visual marker may be moved to a final location on top of the building to more precisely identify the location of the building roof structure, the final location having location coordinates;

providing a computer input capable of signaling user-acceptance of the final location of said marker; and,

providing visual access to one or more oblique images of an aerial imagery database corresponding to location coordinates of the final location.



**2**. The process of claim **1** and wherein said first location data comprised street address data, and wherein said location coordinates of said final location are translated to latitude and longitude coordinates.

**3**. The process of claim **2** and wherein said image corresponding to the first location data is from a first imagery database from which said final location is selected and is internet-based imagery having a corresponding street address look up field, and wherein the aerial imagery database is a second imagery database, and further comprising the act of:

using said latitude and longitude coordinates to access imagery from the second imagery database.

**4**. The process of claim **3** and further comprising the act of:

generating, in computer memory, outline drawings around outlines corresponding to roof planes based on tracing from said imagery from said second imagery database.

**5**. The process of claim **4** and wherein said providing acts are provided over an internet interface.

**6**. The process of claim **5** and further comprising the act of:

providing a printed report that includes an aerial image of the building roof structure.

**7**. The process of claim **1** and further comprising the act of:

generating, in computer memory, outline drawings around outlines corresponding to roof planes based on tracing from said imagery.

**8**. The process of claim **1** and wherein said providing acts are provided over an internet interface.

**9**. The process of claim **1** and further comprising the act of:

providing a printed report that includes an aerial image of the building roof structure.

**10**. The process of claim **9** and wherein the printed report includes a latitude reference and/or a longitude reference corresponding to the location of the building roof structure.

**11**. The process of claim **1**, wherein the user is a customer.

**12**. The process of claim **1**, wherein the user is a commercial vendor.

**13**. The process of claim **1**, further comprising providing visual access to the one or more images of the aerial imagery database corresponding to the final location data.

**14**. A non-transient computer memory storing computer logic, that when executed by computer hardware causes the computer hardware to determine attributes of a roof structure of a real-world three-dimensional building by:

providing at least one computer input field for a user to input first location data generally corresponding to the location of the building;

providing visual access to an aerial image of a region including the roof structure of the building corresponding to said first location data, the aerial image taken from a straight down overhead view with respect to the roof structure;

on the aerial image of the region, providing a visual marker that is moveable on a computer monitor around said region, said visual marker initially corresponding to said first location data, wherein said visual marker may be moved to a final location on top of the building to more precisely identify the location of the building roof structure, the final location having location coordinates;

providing a computer input capable of signaling user-acceptance of the final location of said marker; and,

providing visual access to one or more oblique images of an aerial imagery database corresponding to location coordinates of the final location.

**15**. The non-transient computer memory of claim **14**, wherein said first location data comprised street address data, and wherein said location coordinates of said final location are translated to latitude and longitude coordinates.

**16**. The non-transient computer memory of claim **15**, wherein said aerial image corresponding to the first location data is from a first imagery database from which said final location is selected and is internet-based imagery having a corresponding street address look up field, and wherein the aerial imagery database is a second imagery database, and wherein said computer logic when executed by computer hardware causes the computer hardware to:

use said latitude and longitude coordinates to access imagery from the second imagery database.



**17**. The non-transient computer memory of claim **16**, wherein said computer logic when executed by computer hardware causes the computer hardware to:

generate, in computer memory, outline drawings around outlines corresponding to roof planes based on tracing from said imagery from said second imagery database.

**18**. The non-transient computer memory of claim **17**, wherein said computer logic when executed by computer hardware causes the computer hardware to:

provide a printed report that includes an aerial image of the building roof structure.

**19**. The non-transient computer memory of claim **14**, wherein said computer logic when executed by computer hardware causes the computer hardware to:

generate, in computer memory, outline drawings around outlines corresponding to roof planes based on tracing from said imagery.

**20**. The non-transient computer memory of claim **14**, wherein said providing acts are provided over an internet interface.

* * * * *